**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation (acting by and through its Department of Airports), *Third-Party-Plaintiff-Appellant*, | No. 15-56606 |
| | D.C. No. 2:13-cv-04057-SJO-PJW |
| v. | |
| AECOM SERVICES, INC.; TUTOR PERINI CORPORATION, *Third-Party-Defendants-Appellees*, | OPINION |
| and | |
| BCI COCA-COLA BOTTLING COMPANY OF LOS ANGELES; JAROTH, INC., *Third-Party-Defendants*. | |

Appeal from the United States District Court
For the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted April 5, 2017
Pasadena, California

Filed April 24, 2017

Before:  MILAN D. SMITH, JR. and N.R. SMITH, Circuit Judges, and GARY FEINERMAN, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[**]

**Disability Law / Preemption**

The panel reversed the district court's dismissal of third-party claims brought by the City of Los Angeles for breach of contract and contribution against contractors that allegedly breached their contractual duty to perform services in compliance with federal disability regulations.

Two disabled individuals filed suit alleging that the City's FlyAway bus facility and service failed to meet federal and state accessibility standards.  The City filed a third-party complaint alleging breach of contract by the companies hired to design and construct the bus facility.

The panel held that Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act did not preempt the City's state-law claims.  The panel held that field preemption did not apply because the ADA expressly disavows preemptive federal occupation of the disability-rights field.  Distinguishing a Fourth Circuit case, the panel

---

[*] The Honorable Gary Feinerman, United States District Judge for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

held that conflict preemption also did not preclude the City's claims. The panel disagreed with the district court's conclusion that the states have not traditionally occupied the field of anti-discrimination law, and so the general presumption against preemption did not apply. Applying the presumption, the panel concluded that Congress did not indicate a clear and manifest purpose to preempt claims for state-law indemnification or contribution filed by a public entity against a contractor. The panel remanded the case for further proceedings.

## COUNSEL

Timothy T. Coates (argued) and Edward L. Xanders, Greines Martin Stein & Richland LLP, Los Angeles, California; Kevin Gilbert, Lozano Smith, Walnut Creek, California; Kerrin Tso, Los Angeles City Attorney's Office, Los Angeles, California; for Third-Party-Plaintiff-Appellant.

Robert Nida (argued), Edward Wei, and Nomi L. Castle, Castle & Associates APLC, Beverly Hills, California, for Third-Party-Defendant-Appellee Tutor Perini Corporation.

Noel Eugene Macaulay (argued) and Steven H. Schwartz, Schwartz & Janzen LLP, Los Angeles, California, for Third-Party-Defendant-Appellee AECOM Services, Inc.

Christine Van Aken, Chief of Appellate Litigation; Dennis J. Herrera, City Attorney; City Attorney's Office, San Francisco, California; for Amici Curiae League of California Cities and California Association of Joint Powers Authorities.

**OPINION**

M. SMITH, Circuit Judge:

This appeal presents a single legal question that has not yet been addressed by our court: Do Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (§ 504) preempt a city's state-law claims for breach of contract and *de facto* contribution against contractors who breach their contractual duty to perform services in compliance with federal disability regulations? For the reasons set forth in this opinion, we hold that neither Title II nor § 504 preempts such claims.

**FACTUAL AND PROCEDURAL BACKGROUND**

Two disabled individuals filed suit against Appellant City of Los Angeles (the City), alleging that the City's FlyAway bus facility and service—a bus system that provides transportation between Los Angeles International Airport and various locations—failed to meet the accessibility standards set forth in Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*; § 504 of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*; and various California statutes. The complaint specifically alleged that the FlyAway bus facility in Van Nuys, California, had been constructed in such a manner that it was inaccessible by disabled individuals. Plaintiffs sought damages, attorneys' fees, and an injunction requiring the City to modify its Van Nuys FlyAway facility so that it would become compliant with state and federal disability access standards.

The City subsequently filed a third-party complaint against Appellees AECOM Services, Inc. (AECOM) and

Tutor Perini Corporation (Tutor).**[1]**  The City's third-party complaint alleged that pursuant to the contract entered into by the City and the company hired to design and construct the Van Nuys FlyAway facility (which was AECOM's predecessor-in-interest), AECOM was obligated "to defend, indemnify, and hold harmless the City against all suits, claims, losses, demands, and expenses *to the extent that any such claim results from the negligent and/or intentional wrongful acts or omissions of [AECOM]*, its subcontractors, officers, agents, servants, [or] employees."   (emphasis added).   The complaint also tracked the language of the contract, pursuant to which AECOM's predecessor-in-interest agreed

> to defend, indemnify and hold City . . . harmless from and against all suits and causes of action, claims, losses, demands and expenses . . . to the extent that any claim for personal injury and/or for property damage results from the negligent and/or the intentional wrongful acts or omissions of Consultant, its subcontractors of any tier, and its or their officers, agents, servants, or employees, successors or assigns.

(emphasis added).

The City further alleged that Tutor, the successor-in-interest to another company retained by the City to construct the Van Nuys FlyAway facility, was contractually obligated "to defend, indemnify, and hold harmless the City against all costs, liability, damage or expense . . . sustained as a

---

**[1]** The City also named two other companies as third-party defendants, but neither of those entities is a party to this appeal.

proximate result of the acts or omissions of [Tutor] or relating to acts or events pertaining to, or arising out of, the contract." The contract between the City and Tutor's predecessor-in-interest also required that the contractor, in performing its contractual obligations, "comply with all applicable present and/or future local, . . . State and Federal Laws, statutes, ordinances, rules, regulations, restrictions and/or orders, including . . . the Americans with Disabilities Act of 1990," and stated that "Contractor shall be solely responsible for any and all damages caused, and/or penalties levied, as the result of Contractor's noncompliance with such enactments." The contract also stated that

> [e]xcept for the City's sole negligence or willful misconduct, Contractor expressly agrees to . . . defend, indemnify, keep and hold City . . . harmless from any and all costs, liability, damage or expense . . . sustained as a proximate result of the acts or omissions of Contractor, its agents, servants, subcontractors, employees or invitees; or [] relating to acts or events pertaining to, or arising from or out of, this Contract.

Based on the foregoing contractual provisions between the City and Appellees' respective predecessors-in-interest, the City's third-party complaint against Appellees sought damages for breach of contract, express contractual indemnity, and declaratory relief establishing Appellees' obligations to defend and indemnify the City.

Tutor moved to dismiss the City's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), on the theory that Title II and § 504 preempt the City's claims for indemnification. The district court granted Tutor's motion

to dismiss on preemption grounds. The district court also denied the City's request for leave to amend its complaint, because it believed that any potential amendment would be futile. The City and AECOM then stipulated that the district court could rule on the viability of the City's claims against AECOM on the same basis as it did on Tutor's motion to dismiss because AECOM had asserted an identical preemption defense. The district court subsequently dismissed the City's claims against AECOM in an order substantively identical to the order previously issued in regard to Tutor's motion to dismiss. The City now appeals the district court's dismissal of its third-party claims against Appellees.

## JURISDICTION AND STANDARD OF REVIEW

The district court entered a final judgment as to all parties in this appeal on October 8, 2015. We have jurisdiction over final judgments of the district court pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317 (9th Cir. 2017). We similarly review *de novo* questions of preemption under the Supremacy Clause. *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005).

## ANALYSIS

### I. The Americans with Disabilities Act and the Rehabilitation Act of 1973

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C. § 12132. This echoes § 504 of the Rehabilitation Act, which states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II "extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act of 1973] to all actions of state and local governments," H.R. Rep. No. 101-485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367, and should be read "broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1172 (9th Cir. 2002) (internal quotation marks and alteration omitted). In the context of claims brought under Title II, "the ADA's broad language brings within its scope anything a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (internal quotation marks omitted).

## II. Federal Preemption of State Law

The Supremacy Clause of the United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supreme Court has set forth two principles to guide courts in applying the federal preemption principle embodied in this constitutional provision. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

485 (1996) (internal quotation marks and alteration omitted). Second, "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and ellipsis omitted); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

We have recognized three ways in which a federal law may preempt state legislation:

> First, Congress may preempt state law by so stating in express terms. Second, preemption may be inferred when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicit congressional intent to displace all state law. Third, preemption may be implied when state law actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Bank of Am. v. City & Cty. of S.F.*, 309 F.3d 551, 558 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002) (internal quotation marks and citations omitted).

The Supreme Court has stated, in the context of banking regulations, that the general presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108 (2000). Taken in isolation, this language might suggest that any time the federal government has historically regulated in a given area, the typical presumption against preemption does not apply. However, the Court, in *Wyeth v. Levine*, 555 U.S. 555 (2009), somewhat cabined its language from *Locke* by further explaining the role of historic federal regulation in conducting a preemption analysis:

> Wyeth argues that the presumption against pre-emption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as "independent sovereigns in our federal system" leads us to assume that "Congress does not cavalierly pre-empt state-law causes of action." *Lohr*, 518 U.S. at 485 . . . . The presumption thus accounts for the historic presence of state law but *does not rely on the absence of federal regulation*.

*Id*. at 565 n.3 (emphasis added). *Locke*'s assertion that the presumption against preemption will not apply "where there has been a history of significant federal presence" must therefore be considered in conjunction with the specific circumstances attendant to banking regulations, and particularly the fact that in *Locke*, a state had "enacted legislation in an area where the federal interest has been

manifest since the beginning of our Republic." *Locke*, 529 U.S. at 99. The Supreme Court found a wholly different situation in *Wyeth*, and, although Congress had enacted a "significant public health law" as early as 1906, the Court nevertheless recognized public health and safety as a realm in which the presumption applies. 555 U.S. at 565–66, 565 n.3.

## III.     Neither Title II nor Section 504 Preempts State-Law Claims for Contribution

Neither Title II nor § 504 contains a statement of express preemption, and no party in this appeal contends otherwise. The district court's opinion suggests, however, that field preemption applies to preclude Appellant's claims. We disagree. Field preemption occurs "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation," or "where the field is one in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (internal quotation marks omitted). Title II specifically states that "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of . . . any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b). In other words, the ADA expressly disavows preemptive federal occupation of the disability-rights field.

Nevertheless, we may affirm on any basis finding support in the record, and Appellees contend—as they did before the district court—that conflict preemption precludes the City's claims. Appellees' argument rests largely upon

the Fourth Circuit Court of Appeals' decision in *Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597 (4th Cir. 2010). That case concerned a housing developer that filed crossclaims for implied and express contractual indemnification against the architect of its properties, seeking damages stemming from those properties' failure to comply with, *inter alia*, the ADA's disability accessibility requirements. *See id*. at 599. The Fourth Circuit held that the ADA preempted the developer's claim for indemnification, and further concluded that granting the developer leave to amend to include a claim for contribution would be futile, because any contribution claim would be a *de facto* indemnification claim, and thus similarly preempted. *Id*. at 602.

The *Equal Rights Center* court found that obstacle preemption, which is a subset of conflict preemption, applied to the claims there at issue. *Id*. at 601–02. It explained that the purpose of the ADA is "regulatory rather than compensatory," and that therefore "denying indemnification encourages the reasonable care required by the [federal statute]." *Id*. It further emphasized the nondelegable nature of responsibility under the ADA, pursuant to which "an owner cannot insulate himself from liability for discrimination in regard to living premises owned by him and managed for his benefit merely by relinquishing the responsibility for preventing such discrimination to another party." *Id*. at 602 (internal quotation marks and ellipsis omitted).

As an initial matter, the factual circumstances of *Equal Rights Center* materially differ from those in this appeal. Most importantly, the *Equal Rights Center* court emphasized that the developer "sought to allocate the *full* risk of loss to [the architect] for the apartment buildings at issue," and

determined that "[a]llowing an owner to *completely insulate* itself [in that manner] from liability for an ADA or FHA violation through contract [would] diminish[] its incentive to ensure compliance with discrimination laws." *Id*. (emphases added). Here, by contrast, the relevant contractual provisions assign liability to Appellees only to the extent that their own actions give rise to liability. Thus, the *Equal Rights Center* court's concern with permitting a responsible party to completely insulate itself from Title II liability is not in play here. On the contrary, under the present circumstances, the greater concern is the potential for contractors to shield themselves from any liability they caused under both state contract law and federal disability regulations if Title II and § 504 are found to preempt Appellant's claims.[2]

Furthermore, while the developer in *Equal Rights Center* sought leave to amend to add a claim for contribution, the Fourth Circuit affirmed the district court's denial on the ground that the developer "really [sought] to have [the architect] pay *all* damages," and that any such claim would therefore be a "*de facto* claim for indemnification." 602 F.3d at 602, 604. Because the so-called contribution claim really constituted a claim for indemnification, the court declined to

---

[2] We acknowledge that were we to find state-law contribution claims preempted, future plaintiffs could still elect to bring suit directly against the contracting parties. We also acknowledge, however, that as a practical matter, it will often be the public-facing municipal entity that provides the most attractive target for litigation. That is precisely what happened here.

reach the question of whether a genuine state-law claim for contribution would be preempted. *See id*. at 604 n.2.**³**

Appellees also cite *Independent Living Center v. City of Los Angeles*, 973 F. Supp. 2d 1139 (C.D. Cal. 2013) in support of their preemption argument. That district court case concerned a suit for Title II and § 504 liability against the City of Los Angeles, and various owners of residential properties in the City of Los Angeles that received federal funds from or through the City, for having engaged in a "'pattern or practice' of discrimination against people with disabilities in violation of federal and state anti-discrimination laws." *Id*. at 1142. The City crossclaimed for express and implied contribution or indemnity against the property owners. *Id*. at 1143. The property owners moved to dismiss the City's crossclaims. *Id*. The district court found that no cause of action for implied contribution or indemnification exists under Title II or § 504. *Id*. at 1154, 1156. The district court also determined that state-law indemnity and contribution claims posed an obstacle to the full implementation of Title II and § 504, and that they were accordingly preempted. *Id*. at 1160. It reasoned "that

---

**³** Notably, in *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir. 1989), a case upon which the *Equal Rights Center* court relied heavily for its preemption analysis, the Fourth Circuit held that federal securities law preempted claims for indemnification, but that it did *not* similarly preempt claims for contribution. *Id*. at 1108.

In the present case, we do not view the labels of "indemnification" or "contribution" as dispositive of the analysis. Here, though the City may seek "indemnification" for a contractor's wrong-doing, that compensation only constitutes a portion of the City's total liability under federal disability statutes. In other words, the relief sought may be complete indemnification from the perspective of the *contractor's* liability; but it constitutes only partial contribution from the perspective of the *City's* liability exposure.

congressional objectives are best served when parties with duties under the antidiscrimination statutes remain independently responsible for compliance," and held that "allowing public entities regulated by Section 504 and Title II to seek indemnification or contribution through state law to offset their liability would interfere with the methods by which the federal statutes were designed to reach their goal." *Id*. (internal alterations and quotation marks omitted). The court further held that the City's contractual indemnity crossclaim derived from the first-party claims under the ADA and FHA, citing *Equal Rights Center* for the proposition that such claims present an impermissible attempt to contract around the nondelegable nature of a party's duties under the ADA and FHA, and that permitting those claims would therefore undermine federal law. *Id*. at 1161. The *Independent Living Center* court rested its analysis regarding contract claim preemption wholly on *Equal Rights Center*, and did not discuss any difference between claims seeking contractual contribution, and those seeking indemnity. *Id*. We are, of course, not bound in any way by *Independent Living Center*, but we address its reasoning in this opinion as part of our analysis.

The district court in this case declined to address two aspects of *Independent Living Center* that cabin its persuasive effect on the present appeal. First, as the *Independent Living Center* court emphasized, the first-party plaintiffs in that matter alleged that the City had "failed . . . to maintain *policies, practices, or procedures* to ensure that accessible housing units [were] made available and [were] meaningfully accessible to people with disabilities," and that they additionally "*failed to monitor compliance* with the Rehabilitation Act accessibility requirements." *Id*. at 1144–45 (internal quotation marks omitted, emphases added). The court expressly found that "the main focus of [the] lawsuit

[was] the legality of the overall housing program," and that "Plaintiffs did not file this case because a particular building violated provisions under the various statutes." *Id*. at 1148 (internal alterations omitted). Rather, the plaintiffs sought redress for a programmatic failure on the part of the City to maintain adequate policies and oversight under the relevant federal statutes. *See id*. at 1148–49.

That factual circumstance stands in stark contrast to the situation presented by this appeal. Cities implement policies and procedures as part of their standard operation. Were courts to permit a city to contract away its liability to implement policies and procedures that comply with federal disability regulations, they would indeed be permitting delegation of an entity's duties under the ADA. Here, however, the City does not seek indemnification or contribution for damages arising out of its own failure to implement policies or exercise oversight. Rather, it seeks redress for specific construction and design failures related to the FlyAway bus service. Cities usually have no choice but to contract out design and construction of public facilities because they do not have the expertise, personnel, or equipment necessary to construct public projects. They delegate that task by necessity. Accordingly, an important component in a city's doing all it can to fulfill its duties under Title II and § 504 is to require as part of its contracts with necessary third party entities that the requirements of those statutes be met.[4] Permitting enforcement of contract

---

[4] In considering the actions for which Title II intends to impose liability on a public entity, we have previously framed the question in terms of the "outputs" of a public entity:

> Consider, for example, how a Parks Department would answer the question, "What are the services, programs,

claims seeking to hold a contractor liable for duties necessarily delegated to it does not raise the specter of entirely insulating public entities from ongoing Title II or § 504 liability posed by offloading all the city's responsibilities under those laws.

Second, although it found that conflict preemption precluded the City's claims for both contribution and indemnification, the *Independent Living Center* court relies almost entirely on *Equal Rights Center*—a case that

> and activities of the Parks Department?" It might answer, "We operate a swimming pool; we lead nature walks; we maintain playgrounds." It would not answer, "We buy lawnmowers and hire people to operate them." The latter is a means to deliver the services, programs, and activities of the hypothetical Parks Department, but it is not itself a service, program, or activity of the Parks Department.

*Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1174 (9th Cir. 1999) (emphases added). In line with this analysis, the *Zimmerman* court found that the defendant Parks Department was not liable under Title II for employment discrimination, because employment is not a "service, program, or activity" of a public entity within the meaning of Title II, which relates to public services. *Id.*; *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (framing analysis of the scope of Title II as asking whether a given activity constitutes "a normal function of a governmental entity").

Though *Zimmerman* was not a preemption case, its analysis is instructive insofar as it considered Congress' intention for the scope of actions falling under Title II. Preemption analysis focuses, first and foremost, on congressional intent. *See Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016). If one frames the scope of Title II as encompassing a public entity's outputs, this supports the notion that Congress did not intend to preempt claims for liability arising from tasks that a City does not—and in many cases simply cannot—do itself, but must instead contract with others to provide the service.

expressly declined to address whether conflict preemption would apply to claims for contribution, as opposed to those for indemnification. *See Indep. Living Ctr.*, 973 F. Supp. 2d at 1160–61. *Independent Living Center* expresses a clear concern regarding attempts to shift a responsible party's liability under federal disability statutes to another party, and accordingly explains how permitting express contractual indemnification claims poses an obstacle to the regulatory purpose of the ADA. It does not, however, explain how permitting claims for contribution commensurate with a third-party's own wrongdoing would pose a similar obstacle.

As discussed *supra*, analysis under the Supremacy Clause begins with a presumption against preemption, "unless [preemption] was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485. The *Independent Living Center* court held that "the presumption against preemption is inapplicable [to the ADA], because the states have not traditionally occupied the field of anti-discrimination law." 973 F. Supp. 2d at 1157. We disagree with this characterization of the historical legal landscape, and we believe the district court erred in concluding that the presumption against preemption is inapplicable to claims brought under Title II of the ADA.

In *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996), we observed that "[p]rivate causes of action against state actors who impair federal civil rights have not been traditionally relegated to state law." However, the mere co-existence of state and federal causes of action does not support a rejection of the presumption. *See Wyeth*, 555 U.S. at 565 n.3. Similarly, the fact that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs," and that its

"enactment of the ADA represents its judgment that there should be a comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 973 F. Supp. 2d at 1158, does not render the presumption against preemption inapplicable.  As the Supreme Court has explained, the presumption is rooted in federalism concerns.  *See, e.g.*, *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *see also Wyeth*, 555 U.S. at 565 n.3; *id.* at 583–87 (Thomas, J., concurring in the judgment). The relevant question is whether a given area is one in which states have historically had the power to regulate, not whether states have previously regulated in the precise manner or to the degree that the federal government has itself chosen to regulate.  *See Wyeth*, 555 U.S. at 565, 565 n.3. Indeed, if state and federal regulatory choices perfectly aligned, there would be no cause for federal legislation at all. Conversely, if the presumption against preemption failed to apply anytime federal regulations add something to state legislation, the presumption would be a nullity.

States have historically regulated in the area of civil rights generally, and in the field of discrimination against disabled individuals specifically.  *See, e.g., Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 365, 368 n.5 (2001) ("It is worth noting that by the time that Congress enacted the ADA in 1990, every State in the Union had enacted such measures [against disability discrimination]."); *see also Bob-Lo Excursion Co. v. Michigan*, 333 U.S. 28, 33 (1948) (noting that "many states" had at that time enacted civil rights statutes); *Rodriguez v. Barrita, Inc.*, 10 F. Supp. 3d 1062, 1073 (N.D. Cal. 2014) ("Long before Congress passed the ADA, California enacted several statutes to prohibit disability discrimination at the state level.").  We therefore apply the presumption against preemption, and, accordingly, will find preemption only if Congress indicated a "clear and

manifest purpose" to that effect. *Nation v. City of Glendale*, 804 F.3d 1292, 1298 (9th Cir. 2015).

Obstacle preemption applies when a given "state law[] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* Accordingly, whether claims for express contractual indemnification or contribution conflict with Title II and § 504 requires consideration of those statutes' animating purposes and intended consequences.

Congress expressly set forth the purpose of Title II as "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" through "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)–(2). We have noted that "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (listing cases); *see also Weinreich v. L.A. Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act.").

Nothing in Title II or § 504 addresses claims for state-law indemnification or contribution filed by a public entity against a contractor. In *Equal Rights Center*, the Fourth Circuit drew on its reasoning in *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir. 1989), to

nevertheless find contractual indemnification precluded. It explained that

> In holding the indemnification claim [in *Baker, Watts & Co.*] preempted, we analyzed whether the claim represented an obstacle to the regulatory goals of the federal law. We explained that "Congress ha[d] not provided a right to indemnification in the federal securities laws under any circumstances." Furthermore, we emphasized the total nature of a claim for indemnity, concluding that "it would run counter to the basic policy of the federal securities laws to allow a securities wrongdoer . . . to shift its *entire* responsibility for federal violations on the basis of a collateral state action for indemnification." As we explained, "[t]he goal of the 1933 and 1934 Acts is preventive as well as remedial, and 'denying indemnification encourages the reasonable care required by the federal securities provisions.'"

*Equal Rights Ctr.*, 602 F.3d at 601 (internal citations omitted). To the extent that this analysis relies on congressional *omission* of a federal cause of action for indemnification, it turns the presumption against preemption on its head. The basic premise of the presumption is that absent an affirmative indication to the contrary, a federal regulation will not preempt state law. The failure to provide a federal analogue to a state-law cause of action does not meet this standard.

Any concern that a public entity will be able to contract out of Title II or § 504 compliance makes sense in the

context of indemnification for an entity's failure to maintain appropriate policies and practices—in other words, for its failure to take action solely within its control, as was arguably the case in *Equal Rights Center*. Permitting a shift of liability to a party lacking the power to remedy the violation would frustrate the federal statutes' regulatory purpose. As we have stated in the Title III context of landlords and lessees,

> a covered entity may not use a contractual provision to reduce any of its obligations under [the ADA] . . . . [A] public accommodation's obligations are not extended or changed in any manner by virtue of its lease with the other entity. H.R.Rep. No. 101-485(II), at 104, *reprinted in* 1990 U.S.C.C.A.N. 303, 387. The legislative history [of the ADA] confirms that a landlord has an independent obligation to comply with the ADA that may not be eliminated by contract.

*Botosan v. Paul McNally Realty*, 216 F.3d 827, 833 (9th Cir. 2000). This principle applies equally to Title II's requirements for public services. Crucially, however, the third-party claims asserted by the City against Appellees do not seek to shift liability in such a manner.

Unlike the crossclaims at issue in *Equal Rights Center*, the City's third-party claim seeks only to collect for violations arising out of *Appellees' own negligence or wrongdoing*. In this sense, though styled as a claim for "indemnification," the City functionally seeks contribution from Appellees. Allowing the City to seek redress for liability incurred by virtue of a third-party contractor's

actions does not plausibly pose an obstacle to the intended purpose and effect of Title II or § 504. Rather, finding such claims precluded would itself hamper the statutes' regulatory purpose. The most a public entity may be able to do in furtherance of its duties under the respective acts may, in many situations, be to expressly contract for compliance (contractual provisions for which it will potentially have to pay a premium to the contractor). From there, the entity best situated to ensure full compliance may well be the contractor tasked with designing or constructing the public resource in question, and precluding contract clauses for contribution reduces a contractor's incentives to do so. *Cf. Baker, Watts & Co.*, 876 F.2d at 1107 (finding indemnification claims preempted by federal securities law, but stating that "Congress did not remove it from the power of a state to conclude that a state right to *contribution* would further the regulatory purposes of the federal securities laws by holding all violators to account." (emphasis added)).

In sum, neither Title II of the ADA nor § 504 of the Rehabilitation Act preempt the City's state-law claims for *de facto* contribution, however styled, against Appellees.

## CONCLUSION

For the reasons set forth in this opinion, we REVERSE the district court's order dismissing the City's third-party claims, and REMAND for further proceedings consistent with this opinion.