FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE GEO GROUP, INC.,
                    *Plaintiff-Appellant*,

and

UNITED STATES OF AMERICA,
                    *Plaintiff*,

v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA,[*] in his official capacity as Attorney General of the State of California,
                    *Defendants-Appellees*,

and

STATE OF CALIFORNIA,
                    *Defendant*.

No. 20-56172

D.C. Nos.
3:19-cv-02491-JLS-WVG
3:20-cv-00154-JLS-WVG

OPINION

---

[*] Under Fed. R. App. P 43(c)(2), Rob Bonta has been substituted for his predecessor, Xavier Becerra, as California Attorney General.

UNITED STATES OF AMERICA,
                 *Plaintiff-Appellant*,

          and

THE GEO GROUP, INC.,
                         *Plaintiff*,

               v.

GAVIN NEWSOM, in his official
capacity as Governor of the State of
California; ROB BONTA, in his official
capacity as Attorney General of the
State of California; STATE OF
CALIFORNIA,
                 *Defendants-Appellees.*

No. 20-56304

D.C. Nos.
3:19-cv-02491-
JLS-WVG
3:20-cv-00154-
JLS-WVG

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted June 7, 2021
Pasadena, California

Filed October 5, 2021

Before:  Mary H. Murguia, Bridget S. Bade, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee;
Dissent by Judge Murguia

## SUMMARY[**]

### Preemption / Intergovernmental Immunity

The panel reversed the district court's orders denying the motion of the United States and GEO Group, Inc., a company that operates two private immigration detention centers, for a preliminary injunction, and granting the State of California's motions to dismiss and for judgment on the pleadings, in an action brought by the United States and GEO challenging California Assembly Bill 32 ("AB 32"), which phases out all private detention facilities within the state.

The United States Immigration and Customs Enforcement (ICE) relies exclusively on private detention centers in California. The district court denied appellants United States' and GEO's request for preliminary injunctive relief based on its finding they were unlikely to succeed on the merits.

The panel concluded that appellants were likely to succeed on the merits, and the other preliminary injunction factors tipped in their favor.

As a preliminary matter, the panel held that appellants' claims were justiciable. By the end of the decade, AB 32 will deprive the United States of the option to continue contracts with GEO and its other contractors. That result inevitably flows from the statutory language nullifying any

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contract renewals. The panel concluded that based on the United States' standing alone, it had authority to hear the case.

The panel held that AB 32 conflicted with federal law and could not stand.  Under the Supremacy Clause, a state law must fall if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  Under the presumption against preemption, courts assume that federal law does not supersede the historic police powers of the states unless there is a clear and manifest congressional purpose.

The panel held that the district court erred in finding that that the presumption against preemption applied, and that federal law did not preempt AB 32 under conflict preemption.  The presumption does not apply to areas of exclusive federal regulation, such as detention of immigrants.  California did more than just exercise its traditional state police powers – it impeded the federal government's immigration policy.  California has not historically regulated the conditions of detainees in federal custody, and in particular those housed in immigrant detention centers.  In short, AB 32 did not regulate a field which the states had traditionally occupied.  In addition, Congress unambiguously granted the Secretary of the Department of Homeland Security ("DHS") broad discretion over immigrant detention, including the right to contract with private companies to operate detention facilities.  The panel rejected California's and the ACLU's argument that Congress never gave the Secretary of DHS discretion to contract with private parties to operate detention facilities, even though the federal government has relied on private immigration detention centers for decades.  The panel also rejected their arguments that 8 U.S.C. § 1231(g) implied a

limit on the Secretary's discretion, and 8 U.S.C. § 1103(a)(11) permitted the Secretary to contract out detention facilities to states only. Finally, AB 32 conflicted with the Secretary's statutory power to contract with private detention facilities. AB 32 cannot stand because it conflicts with this federal power and discretion given to the Secretary in an area that remains in the exclusive realm of the federal government, and it bars the Secretary from doing what federal immigration law explicitly permits him or her to do.

The panel held that AB 32 discriminated against the federal government in violation of the intergovernmental immunity doctrine. A State violates the discriminatory aspect of intergovernmental immunity when it treats the state more favorably than the federal government without justification. Discrimination exists where the net effects of a state law discriminate against the federal government. The panel held that under this net effect analysis, AB 32 discriminated against the federal government where AB 32 required the federal government to close all its detention facilities, including its ICE facilities, and will not require California to close any of its private detention facilities until 2028.

The panel therefore held that the United States and GEO were likely to prevail on the merits of their motion for a preliminary injunction. The panel held further that the remaining injunction factors also tipped in appellants' favor. Constitutional injuries are irreparable harm. Because AB 32 facially discriminated against the federal government, the United States suffered an irreparable harm. In addition, by establishing a likelihood that AB 32 violated the U.S. Constitution, appellants established that both the public interest and the balance of equities favored a preliminary injunction.

The panel remanded for further proceedings.

Dissenting, Judge Murguia would hold that the district court acted within its discretion in denying a preliminary injunction because the United States and GEO were unlikely to succeed on their conflict-preemption and intergovernmental-immunity claims. She would apply the presumption against preemption and would uphold the district court's determination that the presumption had not been overcome by Congress's clear and manifest intent with respect to the ICE facilities at issue in this case. She wrote that AB 32 said nothing about immigration, and it did not mention the federal government. Therefore, there was no justification for treating AB 32 as a regulation of immigration rather than one of health and safety. Although AB 32 applied to immigration detention facilities in California, it did not apply only to those facilities, rather, it applied to a variety of federal and state facilities. In addition, Congress has not expressed "clear and manifest" intent to overcome the presumption. AB 32 was not preempted, and the United States and GEO were not entitled to a preliminary injunction on the issue.

Further, Judge Murguia would hold that AB 32 does not violate intergovernmental immunity where AB 32 does not discriminate against the federal government and does not directly regulate the federal government. In addition, Judge Murguia dissented from the majority's choice to proceed with de novo review of the remaining preliminary injunction factors, which went far beyond the "limited and deferential" abuse-of-discretion review prescribed by case law.

**COUNSEL**

Michael W. Kirk (argued), Charles J. Cooper, and Steven J. Lindsay, Cooper & Kirk PLLC, Washington, D.C.; Michael B. McClellan, Newmeyer & Dillion LLP, Newport Beach, California; Michael W. Battin, Navigato & Battin LLP, San Diego, California; for Plaintiff-Appellant The Geo Group, Inc.

Mark B. Stern (argued), Daniel Tenny, and Katherine Twomey Allen, Appellate Staff; Randy S. Grossman, Acting United States Attorney; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellant United States of America.

Gabrielle D. Boutin (argued), Deputy Attorney General; Anthony R. Hakl, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees Gavin Newsom, Rob Bonta, and State of California.

Jordan Wells (argued) and Michael Kaufman, American Civil Liberties Union Foundation of Southern California, Los Angeles, California; Mark Fleming, National Immigrant Justice Center, Chicago, Illinois; Mary Van Houten Harper, National Immigrant Justice Center, Washington, D.C.; Eunice Hyunhye Cho, American Civil Liberties Union National Prison Project, Washington, D.C.; Vasudha Talla and Sean Riordan, American Civil Liberties Union Foundation of Northern California, San Francisco, California; Bardis Vakili and Monika Y. Langarica, American Civil Liberties Union Foundation of San Diego & Imperial Counties, San Diego, California; for Amici Curiae

National Immigrant Justice Center, American Civil Liberties Union (ACLU), ACLU of Southern California, ACLU of San Diego & Imperial Counties, and ACLU of Northern California.

Steven J. Wells, Alex P. Hontos, and Timothy J. Droske, Dorsey & Whitney LLP, Minneapolis, Minnesota, for Amicus Curiae Management & Training Corporation.

Sayoni Maitra and Jaime Crook, Center for Gender & Refugee Studies, UC Hastings College of Law, San Francisco, California; Lisa Knox, California Collaborative for Immigrant Justice, San Francisco, California; Jaclyn Gonzalez and Hamid Yazdan Panah, Immigrant Defense Advocates, El Sobrante, California; Alison Pennington, Immigrant Legal Defense, Oakland, California; for Amici Curiae Center for Gender & Refugee Studies, California Collaborative for Immigrant Justice, Immigrant Defense Advocates, and Immigrant Legal Defense.

Jason R. Litt, Rebecca G. Powell, Garen N. Bostanian, and Anna J. Goodman, Horvitz & Levy LLP, Burbank, California, for Amicus Curiae Human Impact Partners.

Sarah P. Alexander, Constantine Cannon LLP, San Francisco, California, for Amici Curiae Immigrant Legal Resource Center, Human Rights Watch, and Freedom for Immigrants.

## OPINION

LEE, Circuit Judge:

In 2019, California Governor Gavin Newsom signed a bill, AB 32, that phases out all private detention facilities within the state.  But because of seasonal and other fluctuations in immigration, the United States Immigration and Customs Enforcement (ICE) relies exclusively on private detention centers in California.  California's law would thus compel the United States to shutter all ICE detention centers within the state.  In contrast, AB 32 carves out many exceptions for the state's various private detention centers.

The United States—along with The GEO Group, Inc., a company operating two of the private immigration detention centers—sued California and sought a preliminary injunction, arguing that AB 32 conflicts with federal law and violates intergovernmental immunity.  The district court ruled largely in favor of California, holding that the well-being of detainees falls within a state's traditional police powers.  We disagree: California is not simply exercising its traditional police powers, but rather impeding federal immigration policy.

Under our preemption principles, states may not enact laws that hinder "the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016). Immigration—in particular, the detention of undocumented immigrants and those slated for removal—falls within the core of exclusive federal powers.  And Congress has given the U.S. Department of Homeland Security (DHS) Secretary the statutory authority to contract with private detention facilities.  AB 32, however, intrudes into the federal sphere

of authority by barring the Secretary from exercising his or her statutory power.

California's law also does not pass muster under the doctrine of intergovernmental immunity, which prevents states from directly regulating or discriminating against the federal government. California has discriminated against the United States because AB 32 provides certain exemptions for state agencies without offering comparable ones for the federal government.

We reverse the district court's orders (i) granting California's motions to dismiss and for judgment on the pleadings and (ii) denying the United States' and GEO's motion for a preliminary injunction.

## BACKGROUND

### I. California Phases Out Private Detention Facilities in the State.

In 2019, then-Acting DHS Secretary Matthew Albence told the House of Representatives Committee on Appropriations that the "influx at the border has especially strained ICE's detention resources." He reported that the number of new detainees had surged 79% in a single year. The federal government houses these detainees in detention facilities until they are either removed from the country or released.

ICE, however, does not build or operate any immigration detention facilities because of "significant fluctuations in the number and location of removable aliens apprehended by DHS," according to the federal government. To avoid spending large sums of money on government-owned buildings that may remain vacant if immigration wanes, ICE

relies only on privately operated detention facilities, including in California. GEO contracted with the federal government in 2019 to operate two such facilities in California.

Meanwhile, not too long after Acting Secretary Albence testified before Congress, Governor Gavin Newsom signed AB 32 into law, which bans private detention facilities in California within this decade. The author of AB 32 explained that the bill provides "a general ban of for-profit, private detention facilities in California—including facilities used for immigration detention." Sen. Judiciary Comm., Bill Analysis of A.B. 32, 2019–2020 Reg. Sess. (Cal. 2019). "We've all seen the current humanitarian crisis play out along the southern border," he continued. *Id.* "No human being deserves to be held in the horrific conditions we've been seeing in these for-profit, private facilities." *Id.*

AB 32 has three sections:

*Section 1:* It amends the California Penal Code by adding § 5003.1, which bans California Department of Corrections and Rehabilitation from entering or renewing a contract with a private, for-profit prison facility located "in or outside of the state." Cal. Penal Code § 5003.1(a)–(b). But the law provides an exception for California's private prisons "in order to comply with the requirements of any court-ordered population cap." *Id.* § 5003.1(e).

*Section 2:* It introduces §§ 9500–9505 to the California Penal Code. First, § 9500 provides definitions:

> (a) "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive

sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding.

(b) "Private detention facility" means a detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement *with a governmental entity.*

*Id.* § 9500 (emphasis added).

Then § 9501 establishes the general rule that "a person shall not operate a private detention facility within the state." *Id.* § 9501. The remaining provisions specify exemptions to the general rule. Most of § 9502's exemptions apply only to certain facilities operating under California state law. *See id.* § 9502(a)–(b), (d), (f)–(g). Two of the exemptions are facially neutral, but one of them exempts school detention centers, which the federal government does not operate. *See id.* § 9502(c), (e). Finally, § 9505 provides two more exemptions. First, a "private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, *not to include any extensions made to or authorized by that contract*." *Id.* § 9505(a) (emphasis added). ICE entered into the contracts before 2020, so they fall within the safe-harbor provision. At the same time, all of ICE's contracts include several extensions, which fall outside this exception. Second, § 9505 exempts a private detention facility renewed under § 5003.1(e). As noted above, § 5003.1(e) provides an exception to comply with court-ordered population caps in state prison.

*Section 3:* It provides that the act's provisions are severable.

## II. The United States and GEO Sue California.

Shortly after the passage of AB 32, Appellants United States and GEO sued Governor Gavin Newsom and then-Attorney General Xavier Becerra (collectively, "California"), seeking a preliminary and permanent injunction against AB 32. They argued that AB 32 was preempted and violated the intergovernmental immunity doctrine. California, in turn, moved to dismiss GEO's complaint and for a judgment on the pleadings for the federal government's complaint.

The district court granted California's motions, found that Appellants were unlikely to succeed on the merits, and denied the request for a preliminary injunction.

### STANDARD OF REVIEW

We review a denial of a preliminary injunction for abuse of discretion. But "the district court's interpretation of the underlying legal principles is subject to de novo review, and a district court abuses its discretion when it makes an error of law." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (quotation marks and alterations omitted).[1] We review de novo the grant of a motion to dismiss for failure to state a claim as well as a

---

[1] Contrary to the dissent's suggestion, we are not engaging in a de novo review of the denial of a preliminary injunction. Rather, we hold that the district court erred in its legal analysis of the preemption and intergovernmental immunity issues. And a district court abuses its discretion when it makes an error of law in denying a preliminary injunction.

motion for judgment on the pleadings.  *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204 (9th Cir. 2020).

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The key question is whether GEO and the United States are likely to succeed on the merits.  We conclude that they are likely to do so, and that the other factors tip in favor of them.

## I.  Appellants' Claims Are Justiciable.

To begin, California questions whether Appellants have standing.  Because GEO and the other private detention companies contracted with the United States in 2019, AB 32's exception for operations existing before January 1, 2020 applies.  The initial period for these contracts ends in 2024, at which time the United States may terminate the contracts.  According to California, since it is unknown whether the federal government will exercise this option, Appellants' only possible injury is a "future contingency that may or may not occur."

We reject this argument.  By the end of the decade, AB 32 will deprive the United States of the option to continue its contracts with GEO and its other contractors. That result inevitably flows from the statutory language nullifying any contract renewals.  "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the

disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974). Based on the United States' standing alone, we have the authority to hear this case. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1647 (2017) (explaining that when there are multiple plaintiffs, "at least one plaintiff must have standing to seek each form of relief requested in the complaint.").

## II. AB 32 Conflicts with Federal Law and Cannot Stand.

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. So a state law must fall to the wayside if "the challenged law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes*, 136 S. Ct. at 1297 (internal quotation marks omitted) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Under this principle of conflict preemption, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Two cornerstones guide our preemption analysis. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)) (internal quotations omitted). Second, under the so-called presumption against preemption, courts should assume that federal law does not supersede the historic police powers of the states "unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Medtronic*, 518 U.S. at 485).

The district court erred in finding that the presumption against preemption applies, and that federal law does not

preempt AB 32 under conflict preemption. This presumption does not apply to areas of exclusive federal regulation, such as detention of immigrants. In any event, Congress unambiguously granted the DHS Secretary broad discretion over immigrant detention, including the right to contract with private companies to operate detention facilities. Given this congressional purpose, AB 32 conflicts with the Secretary's statutory power and discretion.

A. The presumption against preemption does not apply to AB 32.

The district court applied the presumption against preemption, finding that AB 32 regulates the health and safety of people detained within the State of California. And health and safety, the court reasoned, fall within a state's traditional police powers.

The district court, however, erred by defining the relevant regulated area too broadly. To determine the regulated activity, we first look at "the language of the statute itself," which "must ordinarily be regarded as conclusive." *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029–30 (9th Cir. 1998). The context of the state's regulation matters, too. A state cannot automatically trigger the presumption by merely asserting some generic police power divorced from the context of the challenged regulation. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that a state's general police power over fraud did not trigger the presumption because states had not "traditionally occupied" the field of "[p]olicing fraud *against federal agencies*" (emphasis added)); *see also United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012).

If we look at the language of AB 32 as well as its context, it becomes clear that California law regulates the federal government's detention of undocumented and other removable immigrants. Sections 9500 and 9501 prohibit operating a detention facility "pursuant to a contract . . . with a governmental entity." Cal. Penal Code § 9500–9501. AB 32 does not limit "governmental entity" to only state or local governments; it also purposefully includes the federal government, which detains thousands of people within California. AB 32's intentional inclusion of the federal government stands in stark contrast with other provisions in the California Penal Code that apply to the treatment of people held only in state prisons or county jails. *See, e.g.*, Cal. Penal Code § 2650 (stating that the "Mistreatment of Prisoners" provisions apply only to someone "sentenced to imprisonment in the state prison" and, in some cases, county jail); Cal. Penal Code §§ 4000–4032 (setting standards for treatment of people in the "common jails in the several counties of this State"). So the plain language of the statute targets in large part the federal government and its detention policy.

And the context underscores that California did more than just exercise its traditional state police powers—it impeded the federal government's immigration policy. Unlike the state government, the federal government does not enjoy any exemptions from AB 32. If federal detainees might face health and safety risks in private detention centers, then state detainees presumably endure the same dangers as well—yet California curiously provides numerous exemptions for state detainees. If anything, in AB 32, California appears to show less concern for the well-being of its own detainees than it does for persons under federal detention. In short, California's mantra-like invocation of "state police powers" cannot act as a talisman

shielding it from federal preemption, especially given that the text and context of the statute make clear that state has placed federal immigration policy within its crosshairs.[2]

The district court erred in relying on language from *United States v. California* to reason that California exercised its traditional state police powers. 921 F.3d 865 (9th Cir. 2019). In that case, we considered AB 103, which, among other things, authorized the California Attorney General to collect information about the health and welfare of immigrant detainees in privately run facilities. *Id.* at 875–76. We noted in dicta that neither party "dispute[d] that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." *Id.* at 886.

But we made clear in *California* that the statutory provision did not intrude on federal powers because the "[m]ere collection of such factual data does *not (and cannot) disturb any federal . . . detention decision.*" *Id.* at 885 (emphasis added). That law simply did "not regulate whether or where an immigration detainee may be confined." *Id.* In contrast here, AB 32 can and does "disturb" the federal government's "detention decision" because it "regulate[s] . . . where an immigration detainee

---

[2] If we accepted California's argument, then a state could essentially dictate the policies of the federal prison system. For example, suppose hypothetically that Colorado enacts a law mandating eight hours of open space time for all inmates within the state to ensure their mental well-being. That would mean that the federal "supermax" prison in Colorado housing the most dangerous terrorists and criminals would have to provide those eight hours of open space time to them. The dissent points out that there are federal rules governing prisoners that would preempt state law. So, too, here: as explained, Congress gave the Secretary power to detain immigrants in any "appropriate places of detention."

may be confined" by banning the use of private detention facilities. *Id.* The *California* court made clear that a state cannot make such an intrusion into federal policy.

Having defined the relevant area regulated by AB 32, we next ask if California has historically regulated the conditions of detainees in federal custody, and in particular those housed in immigrant detention centers. *Wyeth*, 555 U.S. at 565. California does not even try to argue that it has such a historical practice. Nor could it. No such history exists. Indeed, the federal government exclusively regulates immigration detention. *See United States v. Locke*, 529 U.S. 89, 99 (2000) (holding that the presumption does not apply in areas with a "history of significant federal presence"); *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1155 (9th Cir.), *amended sub nom. City of Los Angeles by & through Dep't of Airports v. AECOM Servs., Inc.*, 864 F.3d 1010 (9th Cir. 2017) (noting that the Supreme Court's decision in *Wyeth* clarified that the holding in *Locke* meant only that the "presumption [] accounts for the historic presence of state law *but does not rely on the absence of federal regulation*") (internal quotations omitted).

The federal government alone has always set immigration policy. And that includes detention and removal of immigrants. "A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice." *Arizona v. United States*, 567 U.S. 387, 409 (2012); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) ("Removal decisions . . . may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances." (internal quotation marks omitted)). Our

case is thus not like *Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016), which involved an identity fraud state law that "touched" upon immigration.  Nor is it like *Knox v. Brnovich*, 907 F.3d 1167, 1177 (9th Cir. 2018), which addressed whether a state law limiting who can collect early election ballots "touched" upon the federal "field of letter carriage and delivery."  Here, AB 32 does not just "touch" upon the area of immigration detention; it bulldozes over the federal government's ability to detain immigrants by trying to ban all the current immigration detention facilities in California.

In short, AB 32 does not regulate a field which the states have traditionally occupied.  To the contrary, it tries to regulate an area—detention of immigrants—that belongs exclusively in the realm of the federal government.  The presumption against preemption thus does not apply.

B. ICE has broad statutory authority to contract for private detention facilities.

Perhaps recognizing that California's law directly undermines the United States' exclusive authority to detain immigrants, California and the American Civil Liberties Union (ACLU) advance a rather audacious argument: They insist that Congress never gave the DHS Secretary discretion to contract with private parties to operate detention facilities, even though the federal government has relied on private immigration detention centers for decades.  If this argument is correct, then ICE lacks statutory authority to privately contract out detention operations.  And no conflict

preemption could exist because, well, there would be no federal law that conflicts with AB 32.**³**

Fortune may favor the bold, but not so if it flies against the statutory text and structure as well as historical tradition. Contrary to California's assertions, Congress gave the Secretary broad discretion to arrange for appropriate detention facilities, including contracting with private companies to operate them.

As the Supreme Court has emphasized repeatedly, the federal government has "broad, undoubted power over the subject of immigration." *Arizona*, 567 U.S. at 394. That is so because "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395 (citations omitted). Thus, "a principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

This broad discretion applies to immigration detention. Congress made that clear. We see it in 8 U.S.C. § 1231, which states that the Secretary "shall arrange for *appropriate* places of detention for aliens . . . ." 8 U.S.C. § 1231(g)(1) (emphasis added). The word "appropriate" represents "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) (noting the "capaciousness" of the term "appropriate and

---

**³** The dissent notes that we spend a quarter of our opinion on addressing whether ICE has statutory authority to contract with private facilities. We do so only because California and the ACLU devoted most of their briefs challenging the Secretary's statutory power.

necessary" in the Clean Air Act). The statute does not limit the Secretary to housing detainees in "appropriate federal" or even "appropriate governmental" places of detention. Rather, as we have recognized in a different context, 8 U.S.C. § 1231(g) grants the Secretary "broad discretion in exercising his authority to choose the place of detention for deportable aliens." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir.), *amended*, 807 F.2d 769 (9th Cir. 1986). The Secretary also has the power "to make contracts . . . as may be necessary and proper." 6 U.S.C. § 112(b)(2). In short, this statutory language— "appropriate" and "necessary and proper"—is a hallmark of vast discretion.[4]

Congress has also made clear in other ways that it delegated to the Attorney General (and now the DHS Secretary) the power to contract with private immigration detention centers. In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress required the executive branch to report to Congress the number of criminal aliens "released from detention facilities of [INS] (whether operated directly by the Service *or through contract with other persons or agencies*)." *See*

---

[4] The dissent points out that § 1231 does not explicitly mention contracting with private immigration detention centers, but that 18 U.S.C. § 4013(a)—which governs federal prisoners in state facilities—explicitly allows the federal government to enter into agreements with "private entities" to house those held in custody by the U.S. Marshal. The dissent thus reasons that the DHS Secretary does not have the statutory power to contract with private entities. But Congress already provided plenary power to the Secretary to "arrange for appropriate places of detention for aliens." 8 U.S.C. § 1231(g)(1). So there was no need to specify private parties. In contrast, the U.S. Marshal does not have such broad powers of detention for federal prisoners, and Congress thus specified the power to contract with private parties.

IIRIRA, sec. 386, 110 Stat. at 3009–654 (emphasis added) (codified at 8 U.S.C. § 1368(b)(2)(A)(i)(I)).  By that time, the executive branch had been contracting with private companies to operate immigration detention facilities for over ten years.  *See* Joan Mullen, Corrections and the Private Sector, NAT'L INST. OF JUSTICE: RSCH. IN BRIEF, Oct. 1984.  Indeed, by 1991, private companies operated half of all immigration detention facilities. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO/GGD-91-21, PRIVATE PRISONS: COST SAVINGS AND BOP'S STATUTORY AUTHORITY NEED TO BE RESOLVED 20 (1991).

And to this day, Congress continues to pass appropriation bills that specifically earmark money for ICE to contract with private detention facilities.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. F, tit. II, § 215(a), 134 Stat 1182, 1457 (2020); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 215(a), 133 Stat. 2317, 2507 (2019); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 210, 133 Stat. 13, 23 (2019); *see also* Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 386, 110 Stat. 3009 (1996) (contemplating detention facilities "operated directly by [ICE] or *through contract with other persons or agencies*" (emphasis added)). *Cf. Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 147 (1937) ("Whatever doubt may be entertained as to the intent of Congress . . . Congress appears to have recognized the validity . . . by [passing several] appropriation Acts").  Common sense dictates that

Congress would not explicitly provide funding for an allegedly unauthorized and unlawful activity.[5]

California and the ACLU resist this textual and common-sense reading of the Secretary's statutory powers. According to them, 8 U.S.C. § 1231(g) implies a limit on the Secretary's discretion, and 8 U.S.C. § 1103(a)(11) permits the Secretary to contract out detention operation to states only. Neither of these arguments withstands scrutiny.

California and the ACLU argue that the second sentence of § 1231(g)(1) limits the Secretary's discretion. It reads:

> The Attorney General shall arrange for
> appropriate places of detention for aliens

---

[5] The district court did not question that the Secretary generally has the authority to contract out detention operations. Instead, the district court found that these statutes did not demonstrate a clear and manifest intent that ICE could contract with private parties to operate detention facilities in part because the statutory language does not explicitly mention private detention facilities. But the relevant question is whether Congress clearly and manifestly granted the Secretary the discretion to enter such a contract. And the answer is clearly "yes." Taken to its logical conclusion, the district court's ruling would require Congress to provide a detailed laundry list of every possible type of expenditure to prevent states from handcuffing the federal government's authority to spend money on it. Otherwise, a state could argue that Congress did not clearly and manifestly intend to prevent state regulation of the federal government's ability to enter into contracts. In any event, DHS issued a regulation that specifically allows the agency to contract with private detention facilities, though the parties dispute the statutory basis to promulgate that regulation. 48 C.F.R. § 3017.204-90 (providing that ICE "may enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services"); *see also Wyeth*, 555 U.S. at 576 ("This Court has recognized that an agency regulation with the force of law can pre-empt conflicting state requirements").

> detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Service—Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

8 U.S.C. § 1231(g)(1).  They argue that the prefatory phrase of that second sentence—"When *United States Government facilities* are unavailable or facilities adapted or suitably located for detention are unavailable for rental"—makes clear that only federal facilities can house immigrant detainees.  Put another way, the word "appropriate" in the first sentence—the Secretary "shall arrange for *appropriate* places of detention of aliens"—refers to "United States government facilities" only.

But such a reading goes against the ordinary meaning of the word "appropriate."  Scalia and Garner, *Reading Law: The Interpretation of Legal Texts*, 70 ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").  The word "appropriate" means "especially suitable or compatible : FITTING." *See* Merriam-Webster Dictionary.  Nothing in § 1231(g)(1) or any other statutory provision suggests that "appropriate" means the "United States government" only.  We know this because another statutory provision, 8 U.S.C. § 1103(a)(11), expressly allows the United States to contract with state and

local governments to house immigrant detainees. California and the ACLU's proffered definition of "appropriate" thus conflicts with the well-established canon that statutory provisions must be read in harmony. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (internal citations omitted)).[6]

California and the ACLU next seize on 8 U.S.C. § 1103(a)(11) to argue that the Secretary may *only* contract out detention operations to "a State or political subdivision of a State." Because Congress only mentioned agreements with states and localities (and not with private companies), it must mean that the Secretary cannot contract with private companies, according to California and the ACLU.

We reject such a reading. The negative inference canon generally does not apply if the list of powers is not exclusive. *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*, 153 F.3d 938, 945 (9th Cir. 1998). Section 1103(a)(11) does not purport to enumerate the exclusive instances when the Secretary may place immigrants in non-federal detention. The statutory provision does not use the words "only," "exclusively," or similar words.[7] And without such a word

---

[6] So what does the second sentence in § 1231(g)(1) mean? It appears to address when the Secretary can spend money to build facilities; it does not purport to limit how the Secretary houses aliens. If the United States wants to build a facility, it can do so only if there are (i) no United States facilities available and (ii) no other places, including private detention centers, available for rent.

[7] In fact, § 1103(a)(11) does not appear to expound on the Secretary's power. Instead, § 1103(a)(11) explains the Attorney

in the statute, the negative inference canon can apply only if "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). And here, we face "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." *Id.* (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

First, such a reading clashes with the canon against implied repeal. As noted before, the United States has contracted with private immigration detention facilities at least as far back as 1984, and indeed, the federal government housed a substantial portion of undocumented and removable immigrants in private facilities by the early 1990s. It would seem highly unusual for Congress to usher in a sea change in the federal government's power to detain immigrants in such an indirect and vague manner when it enacted § 1103(a)(11) as part of the IIRIRA in 1996. *Cf.* Scalia and Garner at 327 ("[I]f statutes are to be repealed, they should be repealed with some specificity."). In fact, the IIRIRA fortified the executive branch's power to contract with private detention facilities by formally codifying § 1231(g), which empowers the executive branch to place immigrants in "appropriate places of detention." 8 U.S.C. § 1231(g) (codifying Pub. L. No. 414, ch. 477, § 242(c), 66 Stat. 163, 210 (1952)).

Second, the text and structure of § 1103 suggest that the provision is about federalism—specifically, the anti-

---

General's powers. Here, "the Attorney General" does not mean "the Secretary of Homeland Security." *See* §1103(a)(1).

commandeering doctrine—and not about specific detention operations.

We begin with the text of § 1103(a)(11). Sub-section (A) authorizes the Attorney General to make payments to states related to their "administration and enforcement of the laws relating to immigration" if the states' actions were taken under "an agreement with a State." *Id.* § 1103(a)(11)(A). The "administration and enforcement of the laws" contemplates far more than just detention operations.

And § 1103(a)(11)(B) then allows the Attorney General to enter into "cooperative agreement[s]" with States for state-run immigration detention facilities. By setting the conditions under which the United States can house immigrant detainees in state and local government facilities, § 1103(a)(11) clarifies that the federal government cannot commandeer state and local governments into serving federal functions.

This reading make sense in historical context. This section was first enacted in 1996—a year before the Supreme Court in *Printz v. United States*, 521 U.S. 898 (1997) resolved a circuit conflict and held that the federal government cannot commandeer states or local officials for background checks. It was thus likely enacted with federalism in mind, not as an exclusive enumeration of delegated powers.

The structure of the 1996 version of 8 U.S.C. § 1103 supports this federalism-based interpretation. *See Kucana v. Holder*, 558 U.S. 233, 246 (2010) (interpreting a provision in line with its neighboring provisions). This section appears at the very beginning of Chapter Twelve of Title Eight—the Chapter addressing "Immigration and Nationality." It is

titled "Powers and duties" and begins sub-section (a) by discussing the Attorney General's powers.[8] 8 U.S.C. § 1103 (1996). From the outset, this placement suggests that § 1103 is concerned with the broadest delegation of powers, rather than the specifics of any particular area.

Sub-section (a)(1) specifies that the Attorney General "shall be charged with the administration and enforcement of this chapter," which includes § 1231: "Detention." *Id.* § 1103(a)(1) (1996). Sub-sections (a)(2) through (a)(6) establish various supporting powers the Attorney General possesses to carry out his or her duties under Chapter Twelve.[9] These broad grants confirm that § 1103 concerned *general* delegation of powers.

The rest of sub-section (a) provides certain limitations to this general delegation when the immigration power touches other constitutional areas. Thus, sub-sections (a)(7) through (a)(9) concerns the overlap of immigration with foreign affairs.[10] Sub-section (a)(7) empowers the Attorney General, "with the concurrence of the Secretary of State," to establish immigration offices in foreign countries. *Id.* § 1103(a)(7) (1996). Similarly, sub-section (a)(8) allows the

---

[8] The 1996 version of § 1103 was enacted before the Secretary was delegated the Attorney General's powers.

[9] 8 U.S.C. § 1103(a)(2) (1996) (supervision of employees); *Id.* § 1103(a)(3) (1996) (power to issue regulations); *Id*. § 1103(a)(4) (1996) (authorize or require employees of the Service or the DOJ to perform the duties of the Chapter); *Id.* § 1103(a)(5) (1996) (power to guard the borders); *Id.* § 1103(a)(6) (1996) (authority to confer the Chapter's power on any employee of the United States with the consent of the Department head).

[10] There were two separate sub-sections (a)(8) and (a)(9) enacted in 1996.

Attorney General, "[a]fter consultation with the Secretary of State," to authorize foreign officers to be stationed in the United States. *Id.* § 1103(a)(8) (1996). And sub-section (a)(9) specifies that those foreign officers will have the power and duties of immigration officers. *Id.* § 1103(a)(9) (1996).

The sub-sections addressing the states—which include the precursor to § 1103(a)(11)—are no different. Sub-sections (8) and (9) concerned the overlap of immigration with federalism. Under sub-section (a)(8), if the Attorney General "determines that an actual or imminent mass influx of aliens arriving off the coast of the United States . . . presents urgent circumstances requiring an immediate Federal response," then the Attorney General may empower a "State or local law enforcement officer, *with the consent of the head . . . under whose jurisdiction the individual is serving*," to perform the functions of a federal employee. *Id.* § 1103(a)(8) (1996) (emphasis added). And sub-section (a)(9)—the 1996 precursor to today's § 1103(a)(11)— authorized the Attorney General to expend funds and enter agreements with states to house immigration detainees. *Id.* § 1103(a)(9) (1996).

Read in harmony with their neighboring provisions, these provisions address the special circumstance where the immigration power touches on federalism—not the exclusive times when the Attorney General/DHS Secretary may contract out detention facilities.

Another statute, 8 U.S.C. § 1357(g), passed at the same time as § 1103(a)(11) corroborates this reading. *See* 8 U.S.C. § 1357(g) (1996). That statute begins by granting the Attorney General the power to "enter into a written agreement with a State" to allow state employees to perform immigration functions. 8 U.S.C. § 1357(g)(1). The next

several sections set federalism-related statutory limits on those agreements. *Id.* § 1357(g)(2)–(8). And the statute concludes by explicitly stating that the sub-section must not be construed as permission to commandeer the states. *Id.* § 1357(g)(9)–(10). It thus prohibited commandeering and established federalism-related conditions on agreements between the federal government and the states.

Federalism stands as an integral thread unmistakably woven into the fabric of our Constitution. So it is no surprise that Congress paid heed to the limits of federal power in the statute. In contrast, agreements with private companies do not pose the same constitutional concerns, so it would make sense for Congress not to address such agreements in the same provision. Taken together, these statutory provisions strongly suggests that § 1103(a)(11) clarified boundaries between the federal government and the states. It did not prohibit the executive branch from continuing to rely on private detention centers.

   C.  AB 32 conflicts with the Secretary's statutory power
       to contract with private detention facilities.

"A state law is preempted where . . . 'under the circumstances of a particular case, the challenged law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hughes*, 136 S. Ct. at 1297 (quoting *Crosby*, 530 U.S. at 373).

Shorn of its creative but ultimately unconvincing arguments, California's case against preemption withers. We are left with these simple facts: the Secretary may arrange for "appropriate" detention facilities (8 U.S.C. § 1231(g)); he or she has the power to contract out detention operations as "necessary and proper" (6 U.S.C. § 112(b)(2)); and the federal government has sole authority

over immigration. The words used in the statute are extremely broad and permissive, and the United States has exclusive domain in this area. It is thus "clear and manifest" that the Secretary has broad power and discretion to arrange for appropriate places of detention, including the right to contract with private companies to operate detention facilities. *Wyeth*, 555 U.S. at 565.

AB 32 cannot stand because it conflicts with this federal power and discretion given to the Secretary in an area that remains in the exclusive realm of the federal government. It bars the Secretary from doing what federal immigration law explicitly permits him or her to do. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1054, 1062 (9th Cir. 2014) ("Preemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal." (alteration omitted)). That is a classic case of conflict preemption.

The procurement cases provide an apt analogy. Consider our decision in *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991). There, California required federal contractors to obtain state licensing. *Id.* at 438. To obtain state licensing, contractors had to meet certain standards. *Id.* at 439. At the same time, the Federal Acquisition Regulations required contractors to meet certain similar but potentially different standards. *Id.* We found conflict preemption because the state, "through its licensing requirements, [was] effectively attempting to review the federal government's responsibility determination." *Id.*; *see also Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *United States v. Virginia*, 139 F.3d 984, 987–89 (4th Cir. 1998); *Student Loan Serv. All. v. District of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018).

Here, the conflict is worse. California is not just placing different limits on the federal government's contracting standards; it is trying to ban contractors from contracting with the federal government altogether—even though Congress allows such contracts involving the uniquely national issue of immigration detention.

AB 32 also conflicts with federal law because it improperly tries to cabin the Secretary's statutory discretion. *Crosby v. National Foreign Trade Council* provides a telling example of what states cannot do. 530 U.S. 363 (2000). In *Crosby*, Massachusetts barred state entities from buying goods or services from someone identified as doing business with Burma. *Id.* at 366. Shortly after, Congress passed a law restricting Burma and granting the President power to impose new (or remove old) sanctions at his general discretion. *Id.* at 373–74. In finding conflict preemption, the Court reasoned that Massachusetts's law "undermines the President's intended statutory authority by making it impossible for him to restrain fully the coercive power of the national economy when he may choose to take the discretionary action open to him." *Id.* at 377. "Quite simply, if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id.*

The lesson of *Crosby* is that where Congress grants a federal officer broad discretion to pursue an objective (*e.g.*, putting pressure on Burma), states may not cabin the discretion of that officer if doing so would stand as an obstacle to that objective.

That reasoning applies here. Congress has entrusted the Secretary with balancing the many different objectives involved with immigration. *See, e.g.*, *Arizona*, 567 U.S. at 395 ("Immigration policy can affect trade, investment,

tourism, and diplomatic relations for the entire Nation . . . . [For example,] [p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."). To carry out these competing objectives, Congress has given the Secretary discretion to arrange for "appropriate" places of detention and to make contracts as he or she determines to be "necessary and proper to carry out [his or her] responsibilities." 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2). This discretion thus includes the authority to contract with private companies to operate detention facilities.

AB 32 denies the Secretary that discretion. And that denial frustrates the Secretary's efforts to balance the competing objectives involved with immigration. As the United States explained, ICE does not build its own detention centers because immigration flow may surge or taper depending on the season, economic conditions in the United States and elsewhere, the current administration's foreign policy, and a host of other reasons. Seeking flexibility, the Secretary made the policy decision to rely exclusively on private detention centers in California. But AB 32 denies the Secretary that policy choice, forcing the agency to close all private detention facilities. Indeed, as GEO rightly argues, California's action does more than "blunt the consequences" of the Secretary's discretionary action—it altogether *prohibits* the Secretary from taking certain discretionary actions.

## III. AB 32 Discriminates Against the Federal Government in Violation of the Intergovernmental Immunity Doctrine.

"Under the Supremacy Clause, 'the activities of the Federal Government are free from regulation by any state.'" *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014)

(quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)). All parties agree that under the intergovernmental immunity doctrine, a state may not "regulate[] the United States directly or discriminate[] against the Federal Government or those with whom it deals." *Id.* (quoting *North Dakota v. United States*, 495 U.S. 423, 436 (1990) (plurality opinion) (Stevens, J.)) (alteration in original). The parties' agreement ends there. The parties dispute whether the law discriminates against the federal government and its contractors.

We hold that, at the very least, AB 32 discriminates against the federal government and thus violates intergovernmental immunity.

"A State violates [the discriminatory aspect of intergovernmental immunity] when it treats [the] state [] more favorably than [the] federal [government] and no 'significant differences between the two classes justify the differential treatment.'" *Dawson v. Steager*, 139 S. Ct. 698, 703 (2019) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814–816 (1989)). A state must "treat those who deal with the [federal] Government as well as it treats those with whom it deals itself." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960); *see also California*, 921 F.3d at 878.

The Supreme Court has held that discrimination exists where the net effects of a state law discriminate against the federal government. *See Washington v. United States*, 460 U.S. 536, 544–45 (1983). And under this net effects analysis, AB 32 discriminates against the federal government. Two facts are undisputed. One, AB 32 requires the federal government to close *all* its detention facilities, including its ICE facilities. Two, AB 32 will not

*require* California to close *any* of its private detention facilities until 2028.[11]

This discrimination occurs in two steps. First, § 9501 generally prohibits any person from operating a private detention facility. *See* Cal. Penal Code § 9501. But then a series of exemptions operate to permanently exempt some state detention facilities,[12] while providing a ten-year phase-out for private state prisons. *See id.* §§ 9502(a)–(b), (d), (f)–(g), 9503, 9505(b), 5003.1(e), (c). State prisons may "renew or extend" a private detention contract to comply with a court-ordered population cap until January 1, 2028. *Id.* § 5003.1(e); 5003.1(c).

AB 32 facially discriminates against the federal government. California created a blanket prohibition and then exempted large swaths of state contractors in line with its own preferences. Meanwhile, it provided no comparable exceptions for the federal government. Put differently, California is the *only* meaningfully "favored class" under AB 32. *Dawson*, 139 S. Ct. at 705. AB 32 thus discriminates

---

[11] At oral argument, counsel for California claimed that the state has now closed its private prisons. But that fact is beside the point. There is a difference between voluntary action and a legal mandate. AB 32 does not *require* California to close its prisons before 2028.

[12] A few exemptions are facially neutral. *See* Cal. Penal Code §§ 9502(c), (e), 9503, 9505(a). But even the facially neutral exemptions will often only practically apply to state entities. Additionally, under *Dawson*, the only sub-sections relevant to the analysis are those that discriminate, not those that are facially neutral. *Dawson*, 139 S. Ct. at 705.

against the federal government and violates the intergovernmental immunity doctrine.[13]

The district court incorrectly applied an exemption-by-exemption analysis to the discrimination analysis. To reach that conclusion, the district court adopted the reasoning in *United States v. Nye County, Nevada*, 178 F.3d 1080 (9th Cir. 1999). But that reliance was misplaced. *Nye County* merely reaffirmed the general principle that statutory schemes should be viewed as a whole, 178 F.3d at 1083–84, 1087, and specified that where "the statute contains a series of exemptions, some of which favor the federal government, others of which favor the state, most of which are unconcerned with the federal/state distinction," then the court focuses "on the individual exemption to determine whether each taken on its own terms discriminates." *Id.* at 1088.

*Nye County* does not apply here. Unlike in *Nye County*, here, AB 32, taken as a whole, discriminates against the federal government. Nor are there cross-cutting exemptions: none of the exemptions expressly benefit the federal government alone. And the great majority of the exemptions

---

[13] The dissent suggests there are significant differences between California and the United States that justify differential treatment. We disagree with the dissent's framing of the issue. The law as written allows only state prisons to "renew or extend" private detention contracts "to comply with the requirements of any court-ordered population cap." Cal. Penal Code § 5003.1(e). The text of the exemption is not limited to court orders existing at the time of enactment; it carves out an exemption for "any court-ordered population cap." *Id.* If federal detention facilities are one day subjected to such an order, they still would not qualify for § 5003.1(e)'s exemption. The exemption thus does not differentiate based on whether an entity is under a court-ordered population cap. It instead hinges on which governmental entity is operating the detention facility. *See Dawson*, 139 S. Ct. at 706.

are not even facially neutral but expressly benefit the state. As GEO rightly points out, "If the discrimination analysis focused on each statutory exception in isolation, a state could easily evade the intergovernmental-immunity doctrine."

The district court also erred in holding that § 5003.1 was relevant here. According to the district court, § 5003.1 benefits the federal government because it prevents California (and only California) from using out-of-state detention facilities. But § 5003.1 does not provide an exemption to the federal government. It merely provides another limitation on California. And California can partially avoid even this limitation by relying on § 5003.1(e), which exempts state prisons subject to a court-ordered population cap.[14]

* * * * *

Because we hold that AB 32 discriminates against the federal government, we need not reach whether it "directly regulates" the United States under the intergovernmental immunity doctrine. As the parties' briefing suggests, it appears unsettled whether a "legal incidence" test or a

---

[14] GEO also makes a separate argument that AB 32's limitations do not apply because the contract falls into California Penal Code Section 9505(a)'s exception, which specifies that AB 32's prohibition does not apply to a "private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract, not to include any extensions made to or authorized by that contract." Without citing any precedent, GEO asserts that its contract options do not constitute "extensions" under Section 9505(a). But ICE may terminate its contract every five years, so it follows that each time ICE declines to terminate the contract it is extending that contract. Thus, the district court did not abuse its discretion in finding that GEO's contract does not fall under Section 9505(a)'s exemption.

"substantially interference" analysis applies. *See, e.g.*, *North Dakota*, 495 U.S. at 423, 451–52 (competing plurality opinions of Justice Stevens and Justice Brennan); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–40 (9th Cir. 2014) (ruling that the state law "*regulate[d]* [the federal government's] cleanup activities *directly*" but also noting that the law "*interferes with the functions of the federal government*" (emphasis added)); *California*, 921 F.3d at 880 (citing cases in which the state law "directly or indirectly affected the operation of a federal program or contract").

## IV.    The Other Injunction Factors Favor Appellants.

In deciding whether to grant a preliminary injunction, courts consider the likelihood of success on the merits as the most important factor. *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). The United States and GEO are likely to prevail on the merits, as detailed above. The remaining injunction factors also tip in their favor.[15]

---

[15] To be entitled to injunctive relief, the United States and GEO must also establish that, without that relief, they are likely to suffer irreparable harm and the balance of equities tip in their favor. *Winter*, 555 U.S. at 20. "If we were in doubt whether [the United States and GEO] satisfied the remaining requirements for injunctive relief, we would remand to allow the district court to assess the likelihood of irreparable injury and to balance the equities." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009). Because "it is clear that these requirements are satisfied," we complete the preliminary injunction analysis here. *See id.* at 1207–08 (assessing irreparable harm and balancing the equities even though the district court decision rested solely on a finding that a movant had not established a likelihood of success on the merits).

A.  The United States suffers irreparable harm.

Constitutional injuries are irreparable harms.  *See, e.g.*, *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011).  Because AB 32 facially discriminates against the federal government, the United States suffers an irreparable harm.

California argues that this irreparable injury is not *immediately* occurring.  Because of AB 32's safe harbor provision, California argues that the appellants cannot suffer an irreparable injury until 2024, the date of the contracts' first extension option.  But that the injury will occur in the future is by itself irrelevant.  A party "does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).  Here, it is indisputable that the United States cannot extend its contracts with GEO and its other contractors in 2024.

B.  Balance of equities and the public interest favor the United States.

"Finally, by establishing a likelihood that [AB 32] violates the U.S. Constitution, [Appellants] have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069.

## CONCLUSION

We profess no opinion on the wisdom of California's law banning private detention centers or the policy implications of so-called "for-profit prisons."  California can enact laws that it believes are best for its people.  But California cannot

intrude into the realm of the federal government's exclusive powers to detain undocumented and other removable immigrants if the state law conflicts with federal law and violates the intergovernmental immunity doctrine. The district court's orders granting Appellees' motions to dismiss and for judgment on the pleadings and denying Appellants' motion for a preliminary injunction are **REVERSED.** The case is **REMANDED** for further proceedings consistent with this opinion.

---

MURGUIA, Circuit Judge, dissenting:

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). In this case, the United States and the GEO Group, Inc. ("GEO"), a company that operates private, for-profit detention centers, contend that they are entitled to a preliminary injunction preventing enforcement of California's Assembly Bill 32 ("AB 32"), which prohibits the operation of "private detention facilities" within the state. The district court granted the motion for a preliminary injunction in part and denied the motion in part. The majority concludes that this was an abuse of discretion. I disagree, and I respectfully dissent.

## I.  Background

This case concerns California's ability to regulate private detention facilities within its borders, which California contends is a matter of public health and safety. In response to reports of substandard conditions, inadequate medical

care, sexual assaults, and deaths in for-profit facilities,[1] the California legislature has taken steps to limit their operation within the state.  California is not the only state to do so: Illinois, Nevada, New York, and Washington have all passed legislation limiting or preventing the operation of private prisons.[2]

California's efforts culminated in AB 32, which generally prevents the operation of private detention facilities in the state of California.  AB 32 has three parts: Section 1 prevents the California Department of Corrections and Rehabilitation ("CDCR") from entering or renewing a

---

[1] According a 2016 report published by the U.S. Department of Justice's Office of the Inspector General, "contract prisons incurred more safety and security violations per capita than comparable [government-run] institutions" between 2011 and 2014.  Dep't of Justice, Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons i, 3–4, 44 (Aug. 2016), https://oig.justice.gov/reports/2016/e1606.pdf; *see also* Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards 7 (Jan. 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf (concluding that "ICE does not adequately hold detention facility contractors accountable for not meeting performance standards").  These health, safety, and security concerns are the focus of several of the amicus briefs in this case, which highlight various governmental reports, news stories, and firsthand accounts of the conditions in private prisons and immigration detention centers.

[2] *See* Rachel La Corte, *Washington State Governor OKs Bill Banning For-Profit Jails*, AP News (Apr. 14, 2021), https://apnews.com/article/legislature-prisons-washington-legislation-immigration-ceda36fec7dfc3a56c8fe8f7a66d3d76; Illinois Way Forward Act, S.B. 667, 102d Gen. Assemb. (Ill. 2021); A.B. 183, 2019 Leg., 80th Sess. (Nev. 2019); A.B. 4484B, 2007–2008 Leg., Reg. Sess. (N.Y. 2007); H.B. 1090, 67th Leg., Reg. Sess. (Wash. 2021).

contract with a "private, for-profit prison facility located in or outside of the state," with some exceptions, *see* Cal. Penal Code § 5003.1; Section 2 prohibits "a person" from operating "a private detention facility within the state," with various exceptions, *see id.* §§ 9501–9505; and Section 3 provides that AB 32's provisions are severable. *See* 2019 Cal. Legis. Serv. ch. 739 (A.B. 32). AB 32 also contains a "safe harbor" exempting any facility "that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of that contract." Cal. Penal Code § 9505(a).

The United States and GEO sued to prevent the enforcement of AB 32 with respect to three groups of facilities in the state of California: Bureau of Prisons ("BOP") facilities, U.S. Marshals Service ("USMS") facilities, and Immigration and Customs Enforcement ("ICE") facilities. At the core of their respective complaints, the United States and GEO argue that the state of California has impermissibly interfered with federal operations. Specifically, they contend that AB 32 is preempted by federal law and that AB 32 violates intergovernmental immunity by directly regulating—or at least discriminating against—the federal government. The district court granted a preliminary injunction with respect to the USMS facilities but denied injunctive relief with respect to the BOP and ICE facilities.[3] Only the ICE facilities are at issue in this appeal.

---

[3] With respect to the USMS facilities, the district court concluded that AB 32 was preempted by a federal statute allowing the Attorney General to make payments "for . . . the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government *or contracts with private entities*." *See* 18 U.S.C. § 4013(a) (emphasis

## II.  Our Review Is "Limited and Deferential."

As the majority acknowledges, we are not tasked with determining whether AB 32 is good policy.  Nor are we tasked with definitively resolving the United States's and GEO's claims that AB 32 is conflict-preempted and violates intergovernmental immunity.  Instead, we are presented with the narrow question of whether the United States and GEO are entitled to temporarily prevent the enforcement of AB 32 with respect to ICE facilities while this litigation plays out in the district court.  More specifically, we must determine whether the district court abused its discretion in concluding they are not.

To obtain a preliminary injunction, the United States and GEO must demonstrate that (1) they are likely to succeed on the merits of their conflict-preemption or intergovernmental-immunity claims, (2) they would suffer irreparable harm absent injunctive relief, and (3) the balance of equities and the public interest favor an injunction.  *Winter*, 555 U.S. at 20; *see also Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  "We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion."  *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per curiam).  "Our review is limited and deferential."  *United States v. California*, 921 F.3d 865, 877 (9th Cir. 2019) (quoting *Sw. Voter Registration Educ. Project v.*

---

added).  By contrast, the district court explained that there was no such "clear and manifest" congressional intent to preempt AB 32 with respect to the ICE facilities because there was no mention of private entities in the statutes governing immigration detention.  As for the BOP facilities, the district court concluded that the United States's claims were not justiciable.  The United States does not challenge this determination on appeal.

*Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam)).

The district court acted within its discretion in denying a preliminary injunction because the United States and GEO are not likely to succeed on their conflict-preemption and intergovernmental-immunity claims.  Accordingly, I part ways with the majority as to the de novo analysis of the conflict-preemption and intergovernmental-immunity claims.[4]  But even if I could join in the majority's analysis on the merits—which I conclude, for the reasons set out below, is inconsistent with our case law—I cannot endorse the majority's choice to proceed with de novo review of the remaining preliminary-injunction factors,[5] which goes far

---

[4] I agree with the majority that the United States's and GEO's claims are justiciable.  *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (explaining that we may consider whether plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" in determining whether there is a constitutional "case or controversy" over which we can exercise jurisdiction) (citation omitted); Majority Op. 15.  Nobody disputes that AB 32 will prevent GEO from operating its existing ICE facilities as "private detention facilities" in California *at some point*— the only question is when.

[5] The majority maintains that it is not engaging in de novo review "of the denial of a preliminary injunction."  Majority Op. 13 n.1.  But it is undisputed that the district court did not consider the harm to the plaintiffs absent a preliminary injunction as to the ICE facilities, nor the balance of the equities with respect to these ICE facilities.  The majority undertakes this analysis in the first instance, which constitutes de novo review.

I also cannot agree that the United States and GEO so clearly have satisfied the requirements for a preliminary injunction as to negate the need to remand to the district court.  *See* Majority Op. 39 n.15.  The situation at bar is a far cry from *Klein v. City of San Clemente*—the case

beyond the "limited and deferential" abuse-of-discretion review our case law prescribes. *See id.* Therefore, I respectfully dissent with respect to the majority's ultimate preliminary-injunction analysis as well.

### III.  AB 32 Is Likely Not Conflict-Preempted.

Nothing in AB 32 prevents the federal government from apprehending and detaining noncitizens who are present in the country unlawfully. Yet the United States and GEO insist that they are likely to succeed on the merits of their challenge to AB 32 because AB 32 is preempted by federal immigration law. In accepting this argument, the majority adopts a narrow view of AB 32 that is not justified by the legislation's text and context nor our case law. I would apply the presumption against preemption and conclude that AB 32 is not conflict-preempted.

### A.  The presumption against preemption applies.

Our preemption inquiry is rooted in the Supremacy Clause, but it is also sensitive to principles of federalism, under which "both the National and State Governments have elements of sovereignty the other is bound to respect." *See*

---

cited by the majority—where the parties seeking an injunction faced the loss of their First Amendment right to engage in time-sensitive political speech. *See id.* (citing 584 F.3d 1196, 1207–08 (9th Cir. 2009)). No such time-sensitive issue exists here. The likelihood of irreparable harm is particularly uncertain given that the contracts at issue do not expire for several years and may even continue past 2024. *See* discussion *infra* Section V. Unresolved issues, like the remaining length of the contracts, are precisely why the case should be remanded to the district court. *Cf. Evans v. Shoshone-Bannock Land Use Pol'y Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (citation omitted) (noting that the grant or denial of a preliminary injunction "is a matter committed to the discretion of the trial judge").

*Arizona v. United States*, 567 U.S. 387, 398 (2012). Accordingly, "when a state regulates in an area of historic state power," *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018), we presume that the resulting state law has not been preempted unless that was the "clear and manifest purpose of Congress," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). This is known as the presumption against preemption, and it holds true even if the state law "'touche[s] on' an area of significant federal presence," such as immigration. *Knox*, 907 F.3d at 1174 (quoting *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016)).

States' historic police powers include regulation of health and safety. *Wyeth*, 555 U.S. at 565 n.3; *Puente Arizona*, 821 F.3d at 1104. To that end, in *United States v. California*, we upheld a state law providing for inspections of federal immigration detention facilities against a preemption challenge, noting that the United States "d[id] not dispute that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." 921 F.3d at 885–86.

Citing *California*, the district court here determined that AB 32 regulated "conditions in detention facilities located in California." The district court took judicial notice of AB 32's legislative history, which supports the conclusion that the state law responds to concerns about the health and welfare of detainees within the state's borders.[6] The district

---

[6] This legislative history included committee analysis referring to the 2016 Department of Justice report documenting "higher rates of inmate-on-inmate and inmate-on-staff assaults, as well as higher rates of staff use of force," at private prisons. *See* Sen. Judiciary Comm., Bill Analysis of Assembly Bill 32, 2019–2020 Reg. Sess., at 7 (July 2, 2019); *see also* Review of the Federal Bureau of Prisons' Monitoring of

court concluded that AB 32 regulates health and safety, falls within California's historic police powers, and is entitled to the presumption against preemption.

This result is consistent with our case law. To be sure, AB 32 goes further than the state health-inspection regulations at issue in *California*. But the majority fails to explain why its narrow view of AB 32—as a regulation of "the federal government's detention of undocumented and other removable immigrants"—should prevail over the district court's broader view of AB 32 as regulating detainee health and safety. *See* Majority Op. 17. AB 32 says absolutely nothing about immigration, and it does not mention the federal government.[7] Therefore, there is no justification for treating AB 32 as a regulation of immigration rather than one of health and safety.

Moreover, we recently explained that "effects in the area of immigration" do not prevent us from applying the presumption against preemption. *Puente Arizona*, 821 F.3d at 1104. The majority slices and dices AB 32 in order to frame it as a regulation of immigration detention, but that is particularly odd considering the United States sought a preliminary injunction with respect to BOP and USMS facilities as well—and obtained an injunction as to the

---

Contract Prisons, *supra* note 1, at 18. Like the district court, we may take judicial notice of legislative history. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012).

[7] On its face, AB 32's prohibitions on private detention apply to (1) "a person" operating a private detention facility, which is necessarily a private entity, and (2) state agency CDCR, which must phase out private prisons by the year 2028 and is prevented from renewing contracts with private detention facilities unless certain exceptions apply. Cal. Penal Code §§ 5003.1, 9501.

USMS facilities—in this very litigation. Although AB 32 applies to immigration detention facilities in California, it certainly does not apply *only* to immigration detention facilities. Rather, AB 32 applies to a variety of federal and state facilities, including the BOP and USMS facilities the district court considered earlier. The majority offers no support for its decision to focus narrowly on the *effect* of AB 32 on only one type of facility—ICE detention centers.[8]

At the end of the day, two concerns seem to animate the majority's conclusion that the presumption against preemption should not apply: the potential burden on the federal government if private companies may no longer operate detention facilities, and the nagging suspicion that California was targeting the federal government's immigration detention facilities with AB 32. Majority Op. 16–18. But neither of these concerns is relevant to the presumption against preemption.

Consider the majority's hypothetical "open space time" law as an illustration. The majority posits that if we accepted

---

[8] The majority suggests that the "language" of a state law is often "conclusive" in determining whether the law is an exercise of the state's historic police power, but that the context of the state law is also relevant and may be able to displace the plain text. Majority Op. 16. It is doubtful that this is the proper test, given that the case cited in support of this proposition appears to focus on the language of the *federal statute* as an indication of Congress's preemptive intent. *See City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1028–29 (9th Cir. 1998) (rejecting a plaintiff's reliance on legislative history of a federal statute, rather than "the language of the statute itself," in determining whether a state law was expressly preempted) (citation omitted). But in any event, the plain language of AB 32 is neutral and not targeted at immigration, and the context of its enactment suggests that California was concerned with the health and safety of detainees, which is a matter within its historic police powers.

California's argument that it was exercising its traditional police powers by enacting AB 32, we would also be required to allow the state of Colorado to mandate eight hours of fresh-air time at the federal "supermax" prison in that state. Majority Op. 18 n.2. Of course, such a regulation would very obviously relate to health and safety of prisoners, a matter of historic state concern. That would not mean, though, that the federal supermax prison—which is operated by the BOP—would be required to provide "the most dangerous terrorists and criminals" eight hours outdoors every day. The presumption against preemption can be overcome, as discussed below, by clear and manifest congressional intent to displace the state law. *See Wyeth*, 555 U.S. at 565. So, if BOP had its own conflicting regulations—for instance, providing that supermax inmates may only have one hour of "open space time"—then those regulations would likely apply. That is not the case with AB 32, because there is no specific federal statute or regulation that AB 32 directly contradicts.[9] What's more, any such state regulation falling directly on federal officials operating a federally owned facility would likely be subject to the limits of the intergovernmental-immunity doctrine, which is entirely separate from the conflict-preemption analysis.

Of course, it is understood that a state cannot simply assert that it is regulating "health and safety" in order to

---

[9] The majority asserts that Congress has granted the Secretary of Homeland Security authority to enter into contracts with private detention facilities. Majority Op. 9. But, as discussed in more detail below, the regulations and statutes the majority cites do not provide any express statement of Congress's intent for the Secretary to enter into such contracts. To be clear, Congress has never expressly spoken on this issue.

insulate any regulation from preemption. Majority Op. 17–18. But nobody meaningfully disputes that the health, safety, and welfare of detainees within a state is within the state's historic police powers. There is no support in our case law for narrowing our view of AB 32 to its potential effects in the immigration context. Therefore, as did the district court, I would apply the presumption against preemption.

## B. Congress has not expressed "clear and manifest" intent to overcome the presumption.

But the presumption against preemption does not end our inquiry, since "a law that regulates an area of traditional state concern can still effect an impermissible regulation of immigration." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 972 (9th Cir. 2017) (as amended) (concluding that Arizona's policy of denying drivers' licenses to DACA recipients was preempted). When the presumption applies, we must determine whether Congress expressed "clear and manifest" intent in federal immigration statutes to preempt AB 32. *Puente Arizona*, 821 F.3d at 1104. Because Congress has expressed no such clear and manifest intent, AB 32 is not conflict-preempted.

The United States and GEO rely on a handful of statutes and regulations to establish Congress's purportedly "clear and manifest" intent to preempt AB 32. Among these federal enactments are 8 U.S.C. § 1231(g)(1), which allows the Secretary of Homeland Security[10] to "arrange for

---

[10] Although § 1231(g) refers to the Attorney General, the statute predates the creation of the Department of Homeland Security. This authority now resides with the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

appropriate places of detention for aliens detained pending removal or a decision on removal," and 6 U.S.C. § 112(b)(2), which allows the Secretary to "make contracts, grants, and cooperative agreements." The district court concluded that this collection of immigration, criminal, and contract law did not "clearly and manifestly express[]" congressional intent to allow federal officials to enter into contracts for private immigration detention facilities. Therefore, the district court determined that AB 32's general prohibition on private detention facilities was not preempted with respect to the ICE facilities at issue here.

While I do not disagree with the majority's conclusion that the Secretary of Homeland Security *may* enter into contracts for private immigration detention, *see* Majority Op. 20–31, that is beside the point. Even if Congress has not *prevented* private immigration detention, Congress certainly has not *clearly authorized* such detention either. Whether the Secretary is *allowed* to enter into contracts is not dispositive—rather, our inquiry turns on whether Congress clearly spoke with respect to the private detention facilities covered by AB 32. At bottom, the collage of statutes and regulations allowing the Secretary to enter into contracts and other agreements for detention of noncitizens says nothing about private companies like GEO, so there is nothing expressing the sort of "clear and manifest" intent necessary to prevent the operation of AB 32's general prohibition on private detention.

To understand why Congress's general statement that the Secretary of Homeland Security may arrange for "appropriate places of detention," 8 U.S.C. § 1231(g)(1), is not enough to provide "clear and manifest" intent to preempt AB 32, consider the differences between the statutes governing ICE detention and USMS detention—both of

which were initially at issue in this case. The USMS statute provides:

> The Attorney General, in support of United States prisoners in non-Federal institutions, is authorized to make payments from funds appropriated for Federal prisoner detention for . . . the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government *or contracts with private entities*.

18 U.S.C. § 4013(a) (emphasis added). Notably, the district court found this language particularly persuasive in concluding that AB 32 was conflict-preempted as to the *USMS* facilities, explaining that "Congress clearly authorized USMS to use private detention facilities in limited circumstances," and citing additional provisions of § 4013 that outline specific eligibility requirements for "a private entity" housing USMS detainees. *See* 18 U.S.C. § 4013(c)(2). By contrast, the immigration-detention statute does not mention "private entities" at all; it explains only that the Secretary may spend funds to "acquire, build, remodel, repair, and operate facilities." 8 U.S.C. § 1231(g)(1). Another section of the immigration statute, 8 U.S.C. § 1103(a)(11), authorizes federal payments for, among other things, "housing, care, and security of persons detained" by the Department of Homeland Security "under an agreement with a State or political subdivision of a State." Again, unlike the USMS statute, this provision does not expressly mention contracts with private entities. In the absence of a clear statement from Congress in the statutes relating to immigration detention, the district court did not err in

concluding that there was no "clear and manifest" intent that could overcome the presumption against preemption with respect to the ICE facilities.

The majority locates Congress's "clear and manifest" intent in general, permissive statutory language. *See, e.g.*, 8 U.S.C. § 1231(g)(1) (allowing Secretary to arrange for "appropriate places of detention"). According to the majority, AB 32 conflicts with Congress's intent to provide the Secretary with broad discretion in the field of immigration detention. Majority Op. 32. But our case law does not support the "conflict with discretion" rule that the majority sets out here. In each of the cases the majority discusses, federal law provided a separate and comprehensive scheme with which a state law interfered. In *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), the federal statute provided a specific and "calibrated" scheme for imposing sanctions on the country then known as Burma, which included certain conditions and exemptions. *Id.* at 377–78 ("These detailed provisions show that Congress's calibrated Burma policy is a deliberate effort 'to steer a middle path.'") (citation omitted). Therefore, a state statute preventing entities from doing business with Burma impermissibly interfered with this scheme. *Id.* at 379. And in *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991), there were separate but "similar" federal licensing requirements with which a state licensing requirement conflicted. *Id.* at 439; Majority Op. 32. Neither of these cases establishes a bright-line rule that interfering with the federal government's discretion is impermissible. Rather, these cases stand for the unsurprising principle that when there is a comprehensive federal scheme in place, there is no room for states to impose regulations that conflict with specific provisions of that scheme.

The Supreme Court has warned us that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992)). The majority's reliance on AB 32's conflict with a federal official's "discretion," unfortunately, veers into the sort of far-reaching inquiry the Court cautioned against. In the specific context of immigration detention, it is far from clear whether Congress intended the Secretary of Homeland Security to enter into contracts with private detention facilities. In my view, that should resolve our preemption inquiry. And the fact that the majority spends approximately a quarter of its entire opinion simply establishing that the Secretary is not *prevented* from entering into such contracts in the first place, Majority Op. 20, suggests that Congress's intent is not so "clear and manifest" in this respect.

Therefore, I would uphold the district court's determination that the presumption against preemption has not been overcome by Congress's "clear and manifest" intent with respect to the ICE facilities at issue in this case. In other words, AB 32 is not preempted,[11] and the United

---

[11] Although the district court also addressed the possibility of field preemption and concluded that AB 32 was not preempted based on the federal government's occupation of the field of immigration detention, the United States and GEO do not specifically challenge this ruling on appeal. So, like the majority, I address only conflict preemption here. *See Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992) (holding that issues raised without argument in an opening brief are abandoned on appeal).

States and GEO are not entitled to a preliminary injunction on this claim.

## IV.  AB 32 Likely Does Not Violate Intergovernmental Immunity.

By its terms, AB 32 applies only to the state department of corrections and private "person[s]."  Cal. Penal Code §§ 5003.1, 9501.  However, the United States and GEO insist that AB 32 violates the principles of intergovernmental immunity by directly regulating, or at least discriminating against, the federal government.  The majority concludes that AB 32 discriminates against the federal government in favor of the state, and that we therefore need not decide whether AB 32 directly regulates the federal government. Again, I respectfully disagree.

### A.  AB 32 does not discriminate against the federal government.

The doctrine of intergovernmental immunity is also rooted in the Supremacy Clause. *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).  There are two types of intergovernmental-immunity challenges: A state law violates intergovernmental immunity if the state (1) directly regulates the federal government or (2) discriminates against the federal government "or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (Stevens, J.) (plurality opinion).  Here, the district court rejected both the direct-regulation and the discrimination challenges. Following the majority's lead, I address the discrimination challenge first.

The "discrimination" type of intergovernmental immunity provides that a state regulation is unlawful when it "discriminate[s] against the federal government and

burden[s] it in some way." *California*, 921 F.3d at 880. "It is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *Id.* at 881. "[A] state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" *Id.* (quoting *Washington v. United States*, 460 U.S. 536, 544–45 (1983)). But a state treating someone else better than the federal government does not amount to discrimination when "significant differences" exist that justify different treatment. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989).

AB 32's prohibition on the operation of private detention facilities is facially neutral: "Except as otherwise provided in this title, a person shall not operate a private detention facility within the state." Cal. Penal Code § 9501. However, the United States and GEO contend that the exceptions to the statute effectively discriminate by treating the state's detention facilities better than their federal counterparts. They assert that the effect of AB 32's exceptions, many of which apply to facilities operating pursuant to certain state laws or licensing schemes, is to require the federal government to close all its facilities while requiring California to close none. This assertion is belied by the record, and in any event, misses a key nuance of our case law: The relevant inquiry is not only whether AB 32 treats federal facilities differently from state facilities, but also whether the different treatment is justified based on significant differences between the two types of facilities. *See Davis*, 489 U.S. at 816.

As the district court explained, each of the exceptions in AB 32 is justified by the characteristics of the facilities exempted. AB 32 enacts an across-the-board prohibition on

the operation of a "private detention facility," which is defined as "any facility in which persons are incarcerated or otherwise involuntarily confined for the purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding." Cal. Penal Code §§ 9500(a), 9501. It then exempts certain types of facilities: juvenile rehabilitative centers, *id.* § 9502(a); civil-commitment facilities, *id.* § 9502(b); educational, vocational, and medical facilities, *id.* § 9502(c); residential care facilities, *id.* § 9502(d); school facilities, *id.* § 9502(e); and quarantine facilities, *id.* § 9502(f). Even if the term "private detention facilities" would encompass all these facilities, it is not difficult to see why the health and safety concerns animating AB 32 would not necessarily apply to these exempted facilities, many of which would already be subject to separate state licensing and health regulations. In other words, there are "significant differences" between these wide-ranging educational and rehabilitative facilities and the "private detention facilities" subject to AB 32's prohibitions. *See Davis*, 489 U.S. at 816. And several of these exemptions *may* be used by the federal government; facially, the exceptions for educational, vocational, medical, and school facilities are not limited to state-licensed entities. *See* Cal. Penal Code § 9502(c), (e); *cf. United States v. Nye County*, 178 F.3d 1080, 1088 (9th Cir. 1999) (explaining that a tax exemption for contractors who work with state universities was not discriminatory because there were no analogous federal institutions in the state).

The United States and GEO focus much of their argument on § 5003.1(e), which allows CDCR—and only CDCR—to renew or extend a contract with a "private, for-profit prison facility" to "comply with the requirements of any court-ordered population cap." California's state

prisons are currently subject to a court order requiring CDCR to "reduce its prison population to 137.5% of design capacity." *See Brown v. Plata*, 563 U.S. 493, 501–02 (2011); *Coleman v. Brown*, 952 F. Supp. 2d 901, 934 (E.D. Cal. 2013) (noting that ongoing monitoring of "design capacity ratio" is necessary). As the United States and GEO point out, this means that CDCR—unlike the federal government—may be allowed to renew contracts with private prisons despite AB 32. But again, this exemption only constitutes discrimination—and a violation of intergovernmental immunity—if there are no "significant differences" between the exempted state facilities and the federally affiliated facilities. *Davis*, 489 U.S. at 816. Here, as the district court recognized, there is a significant difference: CDCR is under a court-ordered population cap; ICE facilities are not.[12]

I agree in principle with the majority that the proper approach is to view AB 32 as a whole in determining whether it discriminates. *Nye County*, 178 F.3d at 1087–88 (explaining that we assess a challenged exemption "in light of the . . . statute as a whole"); *see North Dakota*, 495 U.S. at 438 (Stevens, J.) ("A state provision that appears to treat the Government differently on the most specific level of

---

[12] The federal government *is* subject to several court orders that touch on immigration detention and proceedings, but none relate to facility capacity or population size. *See Gonzalez v. Sessions*, 325 F.R.D. 616 (N.D. Cal. 2018) (requiring the government to provide a bond hearing to certain detainees after 180 days of detention); *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG (DTBx), 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) (requiring bond hearings and "qualified representatives" for certain immigration detainees); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988) (preventing federal government from pressuring Salvadoran nationals to accept voluntary departure).

analysis may, in its broader regulatory context, not be discriminatory."); Majority Op. 37.  But it is not clear how that would change the result the district court reached here. Of course, the "significant differences" justifying particular exemptions are still relevant to our inquiry.  And to the extent we are concerned with the "net result" of AB 32, *see Washington*, 460 U.S. at 538–39—what the majority calls "net effects"—it does seem clear that the result of AB 32 will be the closure of both state and federal private detention facilities that are not medical or educational in nature. Majority Op. 35.  That is because it is undisputed that CDCR is currently operating well under the court-ordered population cap and is therefore subject to the broader prohibition on renewing or extending contracts for private detention.         Cal.    Dep't    of    Corr.    &    Rehab., Population Reports, https://www.cdcr.ca.gov/research/popu lation-reports-2/ (last accessed Aug. 12, 2021) (reporting that CDCR was operating at 111.3% of design capacity as of August 11, 2021).  This data is consistent with California's representations in its briefing and at oral argument that the population-cap exemption has not excused CDCR from closing any private facilities.  The majority characterizes the reality on the ground as "beside the point," because it reads § 5003.1(e) to render compliance with AB 32 optional for the state.  Majority Op. 36 n.11.  However, § 5003.1(e) is not optional.  It allows for extensions or renewals of CDCR's contracts with private prisons only "in order to comply with the requirements of any court-ordered population cap." Because CDCR continues to operate at a capacity well under the court-ordered population cap in *Brown v. Plata*, CDCR cannot currently refuse to close private facilities based on that population cap.  What's more, nothing in AB 32 allows CDCR to enter into *new* contracts with private facilities once

it closes existing facilities—even if CDCR exceeds the court-ordered population cap in the future.[13]

Finally, the majority suggests that California could have provided more exemptions that benefit the federal government. Majority Op. 36–37. That may be, but nothing in our intergovernmental-immunity case law requires a state to provide exceptions that *favor* the federal government. And the lack of exceptions that treat the federal government better than someone else does not constitute discrimination.

In sum, the district court correctly determined that AB 32 does not discriminate against the federal government but instead effects a general prohibition on private detention facilities. Moreover, even if AB 32 discriminated through its use of exemptions that favored the state over the federal government, I would decline to adopt the majority's approach in enjoining AB 32's operation given the existence of AB 32's severability clause. If AB 32's exemptions are the problem, we could simply sever the problematic exemptions rather than enjoining AB 32 altogether. *See Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014) (explaining that California law directs us to consider

---

[13] The majority suggests that because "[t]he text of the exemption is not limited to [court-ordered population caps] existing at the time of enactment, . . . if federal detention facilities are one day subject to such an order, they still would not qualify for § 5003.1(e)'s exemption." Majority Op. 37 n.13. But this is equally true for *any* facility placed under a future court-ordered population cap, not just federal detention facilities. If the current court-ordered population cap on the California system is lifted, AB 32's exemption would cease to apply to CDCR. Any remaining CDCR contracts would expire. And even if a new court-ordered cap were later instituted, the exemption would not allow CDCR to enter into new contracts. *See* Cal. Penal Code § 5003.1(e) (allowing only for extension or renewal of existing contracts).

the inclusion of a severability clause in state or local legislation, which establishes a presumption in favor of severance). Alternatively, as California argues, we could require the state to extend AB 32's exemptions—for example, the population-cap exemption—to the federal government. *Davis*, 489 U.S. at 818.

## B. AB 32 does not directly regulate the federal government.

Because AB 32 does not discriminate against the federal government, the next question is whether AB 32 directly regulates the federal government, which could also violate intergovernmental immunity. AB 32 does not directly regulate the federal government either.

A direct regulation is one that "imposes [a] prohibition on the national government or its officers." *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270 (1943). To that end, we have explained that state laws or local ordinances that restrict the conduct of federal agents and employees like military recruiters, *see United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010), or subject federal property to state safety requirements, *see Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996), constitute direct regulation of the federal government.[14] The

---

[14] Relatedly, a state law violates intergovernmental immunity if it directly regulates an "instrumentality" of the federal government. *See United States v. New Mexico*, 455 U.S. 720, 732 (1982). GEO argues that its facilities are "federal instrumentalities" because their work is very closely related to federal government functions. This argument is not supported by our case law. A federal instrumentality is an entity "so assimilated by the Government as to become one of its constituent parts." *United States v. Boyd*, 378 U.S. 39, 47 (1964) (citation omitted). Federal contractors like GEO are not federal instrumentalities. *See id.* at 48

district court distilled this case law as establishing a "legal incidence" test for state regulations—a state or local regulation directly regulates the federal government if the "legal incidence" of the regulation falls on a federal entity.[15]

However, GEO proposes a novel "substantial interference" test for direct regulation, positing that "under the intergovernmental-immunity doctrine, generally applicable state laws are invalid if they *substantially interfere* with federal operations." Although the majority suggests that it is "unsettled" whether such a test applies in this case, Majority Op. 38–39, the case law does not support GEO's "substantial interference" test—which, notably, the United States does not ask us to apply.

GEO's proposed "substantial interference" test is ostensibly rooted in one of the two competing plurality opinions in *North Dakota v. United States*, 495 U.S. 423 (1990). In *North Dakota*, the Supreme Court upheld a state liquor-labeling regulation against the federal government's

---

(contractors operating federal atomic energy plant were not instrumentalities); *New Mexico*, 455 U.S. at 740–41 (same).

[15] This legal-incidence test originated in the tax-immunity context and requires a court to determine "which entity or person bears the ultimate legal obligation to pay the tax to the taxing authority." *Confederated Tribes & Bands of Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1084 (9th Cir. 2011). If the legal incidence of a tax falls on the federal government, that tax violates intergovernmental immunity; if the tax falls on contractors that are "entities independent of the United States," the tax "cannot be viewed as a tax on the United States itself." *See New Mexico*, 455 U.S. at 738. We have long relied on the legal-incidence test in the context of state taxes that apply to federal contractors. *See, e.g.*, *United States v. Cal. State Bd. of Equalization*, 683 F.2d 316, 318 (9th Cir. 1982); *United States v. Nev. Tax Comm'n*, 439 F.2d 435, 439 (9th Cir. 1971).

intergovernmental-immunity (and preemption) challenges. Justice Stevens wrote the opinion for a four-Justice plurality, applying tax-immunity (legal incidence) principles to conclude that the North Dakota regulation did not violate intergovernmental immunity because it "operate[d] against" suppliers of liquor, not against the federal government. *Id.* at 436–37 (Stevens, J.). Justice Stevens's plurality opinion therefore supports the district court's conclusion that the legal-incidence test is applicable in the context of state regulations, not just state taxes.

Justice Brennan, writing for a separate four-Justice plurality, dissented in part. Justice Brennan explained:

> contrary to the plurality's view, the rule to be distilled from our prior cases is that those dealing with the Federal Government enjoy immunity from state control not only when a state law discriminates but also when a state law *actually and substantially interferes* with specific federal programs.

*Id.* at 451–52 (Brennan, J.). In GEO's view, this language created a new test for direct regulation. And although neither GEO nor the United States can identify any subsequent case explicitly referring to the "substantial interference" formulation, and I have found none, GEO insists that we implicitly adopted such a test in *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014). To be clear, we did not adopt a "substantial interference" test in *Boeing*. Instead, we articulated the longstanding rule that a "*federally owned facility* performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor." *Id.* at 839 (quoting *Goodyear Atomic Corp. v. Miller*, 483 U.S. 174, 181 (1988))

(emphasis added). In *Boeing*, the state had imposed certain environmental remediation requirements on a single radioactive cleanup site owned in part by the federal government. *Id.* at 834–35. We concluded that this constituted an impermissible direct regulation. That conclusion was consistent with our previous direct-regulation case law, which provides that a regulation that proscribes the behavior of federal officials or federal property is "direct" and violates intergovernmental immunity. *See City of Arcata*, 629 F.3d at 991; *Blackburn*, 100 F.3d at 1435.

Whether or not we characterize our direct-regulation test as "legal incidence," AB 32 clearly does not directly regulate the federal government. AB 32 does not prevent a federal actor from doing anything—its prohibition applies to private persons and to CDCR. It is incorrect and a stretch to characterize this as a "direct" regulation—the regulation only affects the federal government, if at all, *through* prohibitions on other, private actors. To the extent we are concerned with state laws that burden the federal government by regulating private parties, those concerns are more appropriately addressed by our preemption case law. *See California*, 921 F.3d at 879–80 (cautioning against stretching intergovernmental-immunity doctrine "beyond its defined scope").

Therefore, I would hold that the district court did not err in concluding that AB 32 does not violate intergovernmental immunity because AB 32 neither directly regulates nor discriminates against the federal government. And because the United States and GEO are not likely to succeed on the merits of this claim *or* their conflict-preemption claim, I would hold that the district court did not abuse its discretion

in denying a preliminary injunction with respect to the ICE facilities.[16]

## V.  The District Court Did Not Abuse Its Discretion.

Separate and apart from my disagreement with the majority's conclusions regarding the United States and GEO's likelihood of success on the merits, I am concerned with the majority's approach to our "limited and deferential" review of the district court's preliminary-injunction decision. *See California*, 921 F.3d at 877. We have explained that the grant or denial of a preliminary injunction "is a matter committed to the discretion of the trial judge," and even a plaintiff with an "overwhelming likelihood of success on the merits" may not be entitled to a preliminary injunction. *See Evans*, 736 F.3d at 1307 (citation omitted). To that end, where the district court has not yet considered all the relevant preliminary-injunction factors, we have remanded for the district court to consider these factors in the first instance. *Id.*; *see also Arc of Cal. v. Douglas*, 757 F.3d 975, 992 (9th Cir. 2014). Regrettably, the majority declines to do so here.

After concluding that the United States and GEO are likely to succeed on the merits of their conflict-preemption and intergovernmental-immunity (discrimination) claims, the majority proceeds to determine in the first instance that the remaining preliminary-injunction factors tip in favor of the plaintiffs. Majority Op. 40. The majority concludes that the United States will suffer irreparable harm absent a preliminary injunction because AB 32 will inflict a constitutional injury. Majority Op. 40. But everyone agrees

---

[16] The district court similarly did not abuse its discretion in denying a permanent injunction based on these claims.

that all of ICE's existing detention facilities—several of which are operated by GEO—may continue to operate in California until at least 2024, at which point the government has the option to terminate the contracts.  Majority Op. 12; *see* Cal. Penal Code § 9505(a) (exempting a "private detention facility that is operating pursuant to a valid contract with a governmental entity that was in effect before January 1, 2020, for the duration of the contract, not to include any extensions").[17]  And the federal government has recently indicated its intent not to renew "contracts with privately operated criminal detention facilities."  *See* Executive Order on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities, 2021 WL 254321 (Jan. 26, 2021).

Given this uncertain record, I see no reason to conclude that the United States and GEO are entitled to the extraordinary remedy of a preliminary injunction while their challenge to AB 32 plays out in the district court.  Perhaps, as the district court concluded with respect to the USMS facilities, the United States may need to take steps now to plan for the transfer of ICE detainees in California.  But the USMS contracts expire in 2021, several years before the ICE contracts do, and it is far from clear that the same irreparable-harm analysis would apply to the ICE facilities. In any event, the district court, not our panel, is in the best position to assess these practical realities in the first instance. *See Evans*, 736 F.3d at 1307.

---

[17] Given the continued uncertainty and limited briefing with respect to whether the contract options constitute "extensions" or part of "the duration of the contract," I would conclude that GEO has not carried its burden to demonstrate that it is entitled to a preliminary injunction based on this "temporary safe harbor" provision.

## VI.  Conclusion

I cannot conclude that the district court abused its discretion in denying the United States's and GEO's request for a preliminary injunction in part.  The district court did not err in determining that California's AB 32, which prohibits the operation of private detention centers to protect detainees within the state's borders, is entitled to the presumption against preemption as a regulation of health and safety within the state's historic police powers, and that Congress did not express any "clear and manifest" intent to overcome that presumption with respect to the ICE facilities at issue in this case.   The district court carefully distinguished between the statute governing USMS detention, which explicitly refers to "contracts with private entities," *see* 18 U.S.C. § 4013(a)(3), and the collection of statutes governing immigration detention, which makes no reference to private entities.   The court did not err in concluding that Congress's intent was clear as to the USMS facilities, but not as to the ICE facilities.

Nor did the district court err in determining that AB 32, a law that applies only to the state department of corrections and private parties, neither directly regulates nor discriminates against the federal government in violation of intergovernmental immunity.  At the end of the day, AB 32 enacts a prohibition on "a person" operating a "private detention facility"; it does not prohibit the federal government from doing anything.  And AB 32's exemptions are permissible because they reflect significant differences between the exempted facilities and the ICE facilities that operate pursuant to contracts with private, for-profit companies.  Therefore, I would affirm the district court's denial of a preliminary injunction with respect to the ICE facilities.

But even if I could agree with the majority that the district court erred as to the merits, the majority goes too far in concluding that the district court abused its discretion in denying a preliminary injunction. The district court's analysis granting a preliminary injunction in part and denying it in part was thorough, thoughtful, and well-reasoned. But because of its conclusion that the United States and GEO were not likely to succeed on the merits of their claims related to immigration-detention facilities, the district court did not have the opportunity to address the irreparable harm, balance of equities, and the public interest in an injunction preventing enforcement of AB 32 with respect to ICE facilities in California. We should not take it upon ourselves to balance these equities in the first instance. *See Evans*, 736 F.3d at 1307. I respectfully dissent.